# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 5, 2017 Session

## STATE OF TENNESSEE v. ANTONIO HENDERSON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 12-05649          Paula Skahan, Judge**

---

### No. W2015-00151-SC-R11-CD – Filed October 5, 2017

---

We granted the application for permission to appeal of the Defendant, Antonio Henderson, in this case to determine whether the evidence is sufficient to support his conviction for especially aggravated robbery. The Defendant contends that the serious bodily injury to the victim occurred after the robbery was complete and that, as a result, he could have committed only an aggravated robbery. We hold that, under the facts and circumstances of this case, the victim's serious bodily injury was inflicted before the Defendant had completed robbing the victim with a deadly weapon. Accordingly, the evidence supports the Defendant's conviction of especially aggravated robbery. Therefore, albeit for different reasons, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Affirmed;
### Case Remanded to the Trial Court

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Stephen C. Bush, Shelby County Public Defender; Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); and Jennifer Case, Assistant Shelby County Public Defender (at trial), Memphis, Tennessee, for the appellant, Antonio Henderson.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Stark and Austin Scofield, Assistant District Attorneys General, for the appellant, the State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant and his co-defendant, Marvin Dickerson, were jointly indicted for one count of especially aggravated robbery and one count of attempt to commit second degree murder as to victim Shabaka Reed; one count of attempt to commit aggravated robbery as to victim Nathan Cannon; one count of attempt to commit aggravated robbery and one count of aggravated assault as to victim Tiffany Fleming; and one count of employing a firearm during the commission of a dangerous felony, all arising from a criminal episode occurring in June 2012. Both defendants were tried together before a jury, and the State adduced the following evidence.

On the night of June 23-24, 2012, Mr. Reed and his girlfriend, Ms. Fleming, were visiting Mr. Reed's uncle, Nathan Cannon. Mr. Cannon lived in the caretaker's house at a cemetery. After playing dominoes for a time, Mr. Reed and Ms. Fleming left in Mr. Reed's car to go to the store, where they bought some beer. They drove back to the cemetery and parked in the back of the parking lot so they could have some privacy.

A short time later, Mr. Reed saw Mr. Cannon run to the back of the car while being chased by two men. Someone opened the back passenger side door, and Mr. Cannon got in the back seat. Mr. Reed saw two men and a "long" gun when the car's door was opened, but Mr. Reed did not see the two men's faces. Mr. Reed heard the two men asking Mr. Cannon, "Where's the money?" and "Where's the dope?"

The two men ordered Mr. Reed out of the car and told him repeatedly not to look at them. After Mr. Reed got out of his car, the two men told him to give them his cell phone, his keys, and his wallet. Mr. Reed complied. According to Mr. Reed, the two men then were "talking amongst each other, and then they decided that they [were] going to put [Mr. Reed] in the trunk." Mr. Reed testified, "At that point, I stood there for a couple of minutes, and I said, in my mind, I'm not going in no trunk of no car." Mr. Reed later clarified that he did not know precisely how much time actually passed. However, he decided that he was going to take the gun after his assailants said that they were going to put him in the trunk of his car.

Having decided to no longer cooperate, Mr. Reed grabbed the gun being held by one of his assailants. A struggle ensued, during which Mr. Reed was shot four times by the man with whom he was fighting. The shooter then got up and ran away. Mr. Reed had surgery and was hospitalized for two weeks after being shot. Additionally, he wore a colostomy bag for five months as a result of his injuries.

During the struggle, Ms. Fleming was able to escape the scene, and she took refuge in some nearby woods. As she was hiding, she heard several gunshots. She returned to the scene after the police arrived.

2

The police recovered four spent nine millimeter shell casings at the scene. A latent print recovered from Mr. Reed's car was identified as that of co-defendant Mr. Dickerson.

Kimberly Spight testified that she loaned her car to her neighbor Angela Boles, who drove the Defendant and Mr. Dickerson to an area near the crime scene. Ms. Spight rode with them. Ms. Spight explained that the two men got out, and she and Ms. Boles waited in the car. A short time later, Ms. Spight heard gunshots. The Defendant and Mr. Dickerson returned to the car, and Ms. Spight noticed that Mr. Dickerson's finger "was bleeding and it was hanging off . . . by a piece of meat." She heard the Defendant say, "I made a mistake and shot my [cohort]."

Ms. Boles drove them to an apartment complex, and the Defendant got out of the car. At that point, Ms. Spight saw a gun. Ms. Boles then drove herself, Ms. Spight, and Mr. Dickerson to the hospital. After Mr. Dickerson was in the hospital, Ms. Spight began driving because Ms. Boles was "shook up." As Ms. Spight was driving, Ms. Boles threw a cell phone out of the car. Ms. Spight was then pulled over by the police and ticketed.

Subsequently, Ms. Spight identified the Defendant from a photographic line-up. In conjunction with her identification, she wrote on the line-up under the Defendant's photograph, "This is Antonio. He was in the car with us. After me and Angela dropped him off. He came back saying he made a mistake & shot Marvin. After we dropped him off, I seen him get out the car with the rifle." Ms. Spight also identified co-defendant Mr. Dickerson from a photographic line-up. In conjunction with her identification, she wrote under Mr. Dickerson's photograph, "This is Marvin. He was the one riding in the car with us. After me and Angela dropped them off. He came back with his finger shot off." Ms. Spight also identified the Defendant and Mr. Dickerson in the courtroom.

After considering this proof, the jury convicted the Defendant and Mr. Dickerson as charged. As to each defendant, the trial court merged the aggravated assault conviction with the attempted aggravated robbery conviction, both of which involved Ms. Fleming as the victim. The trial court subsequently sentenced the Defendant to an effective term of forty-one years of incarceration. The trial court sentenced Mr. Dickerson to an effective term of thirty-seven years of incarceration. The trial court imposed partial consecutive sentences on both defendants.

On direct appeal, the Court of Criminal Appeals affirmed the defendants' convictions. State v. Henderson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627, at *1 (Tenn. Crim. App. June 10, 2016), perm. appeal granted (Tenn. Oct. 24, 2016). With respect to the Defendant's especially aggravated robbery conviction, the intermediate appellate court held that "the serious bodily injury suffered by the victim can precede, be contemporaneous with, *or occur subsequent to* but in connection with the taking of

3

property of another." Id. at *7 (emphasis added). The Court of Criminal Appeals remanded the Defendant's case for further proceedings based on the trial court's failure to make the necessary findings before imposing consecutive sentences. Id. at *21–22. We granted the Defendant's application for permission to appeal in order to address a single issue: whether the evidence is sufficient to support his conviction of the especially aggravated robbery of Mr. Reed.

## Standard of Review

Our standard for reviewing the sufficiency of the evidence underlying a criminal conviction is well-established. First, we examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense. See, e.g., State v. Smith, 436 S.W.3d 751, 761–63 (Tenn. 2014) (conducting statutory interpretation of offense's elements before conducting sufficiency review). Next, we analyze all of the evidence admitted at trial in order to determine whether each of the elements is supported by adequate proof. See, e.g. id. at 764–65. In conducting this analysis, our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings . . . of guilt beyond a reasonable doubt.").

After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We, as an appellate court, do not weigh the evidence anew. Evans, 838 S.W.2d at 191. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This "standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

## Analysis

Our criminal code defines especially aggravated robbery as follows: "Especially aggravated robbery is robbery as defined in [section] 39-13-401: (1) Accomplished with a deadly weapon; and (2) Where the victim suffers serious bodily injury." Tenn. Code

4

Ann. § 39-13-403(a) (2010).[1] Robbery as defined in Tennessee Code Annotated section 39-13-401 is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2010). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a) (Supp. 2012). As to the element of fear or violence, this Court has stated the following:

> Violence is defined as physical force unlawfully exercised so as to injure, damage or abuse. The fear constituting an element of robbery is fear of present personal peril from violence offered or impending. It must be a fear of bodily danger or impending peril to the person which intimidates and promotes submission to the theft of the property.

State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2001) (citations, quotation marks, and brackets omitted).

The statute defining the offense of especially aggravated robbery does not specify at what point in time the serious bodily injury must be suffered by the victim. Thus, we are tasked with construing the statute in order to address this issue of first impression. Issues of statutory construction present questions of law which we review de novo, with no presumption of correctness. State v. Springer, 406 S.W.3d 526, 532-33 (Tenn. 2013) (citing State v. Wilson, 132 S.W.3d 340, 341 (Tenn. 2004)).

---

[1] The final statutory element of "serious bodily injury" is defined as follows:

"Serious bodily injury" means bodily injury that involves:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is eight (8) years of age or less[.]

Tenn. Code Ann. § 39-11-106(a)(34) (Supp. 2012). There is no dispute in this case that Mr. Reed suffered serious bodily injury as a result of being shot four times.

This Court's role in statutory interpretation is to ascertain and effectuate the Legislature's intent. Baker v. State, 417 S.W.3d 428, 433 (Tenn. 2013) (citing Carter v. Bell, 279 S.W.3d 560, 564 (Tenn. 2009)). To that end, we begin with the actual words of the statute, to which we accord their natural and ordinary meaning. Id. (citing Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 526 (Tenn. 2010)). We endeavor to construe statutes in a reasonable manner which avoids statutory conflict. Id. (citing Frye v. Blue Ridge Neuroscience Ctr., P.C., 70 S.W.3d 710, 716 (Tenn. 2002)). "[W]e presume that every word in the statute has meaning and purpose and should be given full effect if the obvious intent of the General Assembly is not violated by so doing." Larsen-Ball v. Ball, 301 S.W.3d 228, 232 (Tenn. 2010). When the language of a statute is clear and unambiguous, "the legislative intent shall be derived from the plain and ordinary meaning of the statutory language." Wilson, 132 S.W.3d at 341 (citing Carson Creek Vacation Resorts v. Dep't of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993)). However, if the language of a statute is ambiguous, we must look to the entire statutory scheme and rely upon well-established canons of statutory construction in order to ascertain the legislative intent. See State v. Marshall, 319 S.W.3d 558, 561 (Tenn. 2010) (citing State v. Sherman, 226 S.W.3d 395, 401 (Tenn. 2008)); Wilson, 132 S.W.3d at 341 (citing Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).

Returning to the statutory definition of especially aggravated robbery, we note that the word "accomplished" is not defined in our criminal code. Accordingly, our Court of Criminal Appeals has looked to the dictionary definition of the word "accomplish," noting its meaning as "'1: to bring about (a result) by effort . . . 2: to bring to completion: fulfill.'" State v. Farmer, No. M2007-01553-CCA-R3-CD, 2008 WL 3843847, at *7 (Tenn. Crim. App. Aug. 18, 2008) (quoting Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/accomplish (last visited July 21, 2008)), perm. appeal denied (Tenn. Mar. 2, 2009); see also State v. Anderson, No. M2009-00494-CCA-R3-CD, 2011 WL 285705, at *6 (Tenn. Crim. App. Jan. 20, 2011), perm. appeal denied (Tenn. May 25, 2011). Thus, in drafting the especially aggravated robbery statute, our legislature intended that the underlying robbery offense be considered complete at some discrete point in time.

Likewise, the word "where" is not defined in our criminal code. As used in the especially aggravated robbery statute, however, the dictionary definition of "where" is "in which." See, e.g., Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/where (last visited July 20, 2017). We also find it helpful to consider the construction of the two other types of criminal offenses that include the statutory element "where the victim suffers serious bodily injury."

6

First, the offense of especially aggravated kidnapping is committed when the perpetrator falsely imprisons[2] the victim and "[w]here the victim suffers serious bodily injury." See Tenn. Code Ann. § 39-13-305(a)(4) (2010) (defining especially aggravated kidnapping). Our Court of Criminal Appeals has recognized that "[a] plain reading of the [especially aggravated kidnapping] statute indicates that a conviction for the kidnapping offense requires proof only that the victim's serious bodily injury occurred *during* the unlawful confinement . . . ." State v. Combs, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL 31118329, at *62 (Tenn. Crim. App. Sept. 25, 2002) (emphasis added), perm. appeal denied (Tenn. Jan. 27, 2003); see also, e.g., State v. Leonard, No. M2001-00368-CCA-R3-CD, 2002 WL 1987963, at *15 (Tenn. Crim. App. Aug. 28, 2002) (holding evidence sufficient to support especially aggravated kidnapping conviction where proof showed that victim suffered four gunshot wounds "during the unlawful confinement"), perm. appeal denied (Tenn. Dec. 16, 2002); cf. State v. Whited, No. M199800478CCAR3CD, 1999 WL 1209786, at *8 (Tenn. Crim. App. Dec. 17, 1999) (holding that, "[b]ecause there is no proof that [the victim] sustained serious bodily injury *during* an unlawful *confinement* perpetrated by Defendant, . . . the evidence was insufficient to support the conviction for especially aggravated kidnapping").

Second, the offense of especially aggravated burglary is defined as the "(1) [b]urglary of a habitation or building other than a habitation;[3] and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-14-404(a) (2010) (footnote added). When considering the sufficiency of the proof to support an especially aggravated burglary conviction, our intermediate appellate court has held that the evidence was sufficient to support the conviction where the proof established that the defendant hit and injured the victim "*during* the home invasion." State v. Marlin, No. M2011-00125-CCA-R3-CD, 2011 WL 5825778, at *13 (Tenn. Crim. App. Nov. 17, 2011) (emphasis added).

These decisions support by analogy the conclusion that the serious bodily injury suffered by the victim of a robbery accomplished by the use of a deadly weapon must be sustained *during* the commission of the robbery. See also State v. Kimbrough, 924 S.W.2d 888, 891 (Tenn. 1996) (concluding that especially aggravated robbery is one of the offenses created by our legislature specifically to recognize "those instances in which bodily injury occurs *during the commission of a crime*" and that "Tennessee law allows for enhanced punishment based on the degree of bodily injury the defendant inflicted on

---

[2] "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2010).

[3] "A person commits burglary who, without the effective consent of the property owner: (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault; (2) Remains concealed, with the intent to commit a felony, theft or assault, in a building; [or] (3) Enters a building and commits or attempts to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a) (2010).

the victim *during the commission of* certain inherently dangerous offenses" (emphases added)). Therefore, based on the foregoing authority and reasoning, we hold that the victim of an especially aggravated robbery must suffer his or her serious bodily injury during the commission of the underlying theft, i.e., before the accused has completed the theft of property. This conclusion, however, simply posits another question: at what point is the theft underlying a robbery complete?

In State v. Owens, this Court considered as an issue of first impression "the temporal relationship required between the taking and the act of violence or putting a person in fear as they together constitute the offense of robbery defined in" Tennessee Code Annotated section 39-13-401. 20 S.W.3d 634, 637 (Tenn. 2000). Noting that our legislature had mandated that we construe our criminal statutes "'according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code,'" id. at 640 (quoting Tenn. Code Ann. § 39-11-104 (1997)),[4] the Owens Court adopted the common law rule that "the use of violence or fear must precede or be contemporaneous with the taking of property from the person to constitute the offense of robbery," id. at 641. The Owens Court specifically rejected the "continuous offense theory." Id. 640–41. This theory posits the commission of a robbery "'not only if the perpetrator uses force or intimidation to take possession of the property, but also if force or intimidation is used to retain possession immediately after the taking, or to carry away the property, or to facilitate escape,'" id. at 639 (quoting State v. Meyers, 620 So.2d 1160, 1163 (La. 1993) (internal quotation marks omitted)). The Owens Court rejected the continuous offense theory in large part because most of the jurisdictions that adopted it had "done so with the help of statutes which specifically define robbery to include the use of force to retain property or to escape." Id. In light of its conclusion that the force or violence required for a robbery must be used prior to or contemporaneously with the underlying theft, the Owens Court held that the evidence was not sufficient to support the defendant's conviction of robbery where the proof demonstrated that he took an item of clothing from a retail store without paying for it, ran several blocks away, and only then brandished a box cutter at an employee who had given chase and was closing in. Id. at 641. Thus, Owens stands for the proposition that a robbery offense is complete only after the accused has completed the underlying theft. See also State v. Alston, 465 S.W.3d 555, 567 (Tenn. 2015).

Several years later, in State v. Swift, this Court considered an aggravated robbery conviction imposed after the defendant took two video games from a store shelf, hid them in his pants, and then walked to the front of the store. 308 S.W.3d 827, 829 (Tenn. 2010). At the front of the store, two employees attempted to stop the defendant, and the

---

[4] Although the Owens Court was quoting a 1997 statute, that mandate was still in place at the time the instant crimes were committed in 2012 and remains in place today. See Tenn. Code Ann. § 39-11-104 (2010, 2014).

8

defendant swung a knife at them.  Id.  The two employees retreated, and the defendant left the store with the items.  Id.  The Swift Court framed the issue as "whether the location of the use of violence or fear is relevant in distinguishing theft from robbery."  Id. at 828.  Reasoning that "the taking was complete when [the defendant] removed the [video] games from their cases and concealed them in his pants, evincing his intent to deprive Best Buy of the property," id. at 831, the Swift Court held that the evidence was not sufficient to support the aggravated robbery conviction because "[the defendant's] use of violence and fear did not precede or occur contemporaneously with the removal and concealment of the games.  [The defendant] walked toward the exit and swung a knife at the Best Buy employees several minutes after the taking was complete."  Id.  Rejecting the significance of the location at which the accused uses fear or violence, the Swift Court held that "[t]he temporal proximity between the taking of property and the use of violence or fear is the sole relevant factor."  Id. at 831.  The Swift Court modified the defendant's conviction of aggravated robbery to the lesser-included offense of aggravated assault.  Id. at 831-32.

These cases clearly distinguish between a theft and a robbery.  As set forth above, a robbery "is the intentional or knowing theft of property from the person of another *by* violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a) (emphasis added).  That is, the theft has to be accomplished via the use of violence or fear.  If the theft is accomplished through stealth, as it was in Swift, a subsequent violent encounter in an effort to retain the property from repossession by its rightful owner may constitute an aggravated assault, but it will not constitute an aggravated robbery.

Both Owens and Swift also recognized, at least implicitly if not explicitly, the significance of the accused's conduct and intent with respect to determining whether he had completed his theft by the time the violence occurred.  In Owens, the defendant had left the store with the stolen item and did not threaten the employee until the defendant was several blocks away from the store.  Under those circumstances, the proof established that the defendant had completed his theft well before brandishing his weapon.  Although Swift presented a much closer question, the Swift Court concluded that the proof in that case also demonstrated that the defendant had no intention of taking any more merchandise from the store by the time he was accosted by the store's employees.  Accordingly, the Swift Court concluded that the defendant's theft was complete several minutes prior to his violent encounter with the store's employees.

In reaching its conclusion that the defendant had completed his theft before reaching the front of the store, the Swift Court relied on the shoplifting statute which provides, in pertinent part, that, for purposes of the theft statute, a person commits theft of merchandise "'if the person, with the intent to deprive a merchant of the stated price of merchandise, knowingly . . . [c]onceals . . . [r]emoves, takes possession of, or causes the removal of merchandise[.]'"  Swift, 308 S.W.3d at 831 n.5 (quoting Tenn. Code Ann. § 39-14-146(a)(1)–(2) (2006)).  Following Swift, our Court of Criminal Appeals has

9

struggled to apply this aspect of the decision to different fact scenarios. See, e.g., State v. Harris, No. W2015-00500-CCA-R3-CD, 2016 WL 2594964, at *2–4 (Tenn. Crim. App. May 3, 2016) (defendant challenged aggravated robbery conviction where proof demonstrated that he got into driver's seat of victim's car while victim was in store, closed driver's door, and brandished a weapon only after victim began approaching the car before defendant drove away); State v. Crenshaw, No. W2014-01367-CCA-R3-CD, 2015 WL 2447717, at *5 (Tenn. Crim. App. May 22, 2015) (upholding aggravated robbery conviction where defendant dragged trash can full of clothing to front of store and then had altercation with employee as defendant tried to leave because defendant did not evince his intent to deprive store of property until altercation, distinguishing Swift on basis that property was not concealed), perm. appeal denied (Tenn. Sept. 18, 2015); State v. Turner, No. E2010-02540-CCA-R3-CD, 2012 WL 1077153, at *6–8 (Tenn. Crim. App. Mar. 30, 2012) (upholding aggravated robbery conviction where defendant pushed a loaded shopping cart past cashier in retail store and then threatened employee with screwdriver before leaving store, distinguishing Swift on basis that defendant had not concealed merchandise before encounter), perm. appeal denied (Tenn. Aug. 16, 2012); State v. Johnson, 366 S.W.3d 150, 154–57 (Tenn. Crim. App. 2011) (upholding aggravated robbery conviction where defendant carried items to door of retail store and brandished a knife at employee attempting to block him, distinguishing Swift on basis that defendant had not concealed the merchandise before the encounter). However, the Swift Court was not called upon to determine at what point under other circumstances a defendant could be deemed to have finally demonstrated his "intent to deprive a merchant of the stated price of merchandise." Arguably, this moment might not occur until the defendant reaches the door of a retail establishment (or drives off in the stolen car) because, until that time, the defendant has the opportunity to change his mind about stealing the item(s). See, e.g., State v. Morrison, No. M2014-00762-CCA-R3-CD, 2016 WL 837360, at *1 (Tenn. Crim. App. Mar. 4, 2016) (noting that witness "explained that Walmart's policy was to allow suspected shoplifters to exit the building before being approached by a store employee in order to give the individual 'every possibility to pay for the merchandise'"). In retrospect, we suggest that a more helpful application of the "temporal proximity" required by the robbery offenses would focus, as we do in this case, on the circumstances indicative of the defendant's conduct and intent to determine whether, at the moment in time at issue, the defendant has definitively completed every element of the underlying theft. This focus should include an examination of whether the defendant has completed his theft of all the property he intended to steal.

Facing facts somewhat similar to those in this case, our Court of Criminal Appeals has upheld an especially aggravated robbery conviction when the proof demonstrated that the defendant had *not* completed his theft by the time he shot the victim. In Hill v. State, the intermediate appellate court considered a post-conviction proceeding in which the defendant was challenging his especially aggravated robbery conviction. No. W2009-01481-CCA-R3-PC, 2010 WL 4027728, at *1 (Tenn. Crim. App. Oct. 14, 2010), perm. appeal denied (Tenn. Feb. 17, 2011). The defendant claimed that both his trial and

appellate lawyers "were ineffective in failing to challenge the sufficiency of the evidence [supporting his conviction] based on his claim . . . that the robbery was completed at the time that the victim was shot." Id. at *7. The proof at trial established that the defendant had taken money from the victim by holding a gun to the victim's head. Id. at *1, 12. Convinced that the victim also had drugs, the defendant was attempting to ascertain the location of the drugs in order to add them to his spoils when the victim was able to run away, only to be shot "immediately" by the defendant. Id. at *12. The Court of Criminal Appeals concluded, correctly in our view, that the victim had suffered his serious bodily injury during the commission of the aggravated robbery because the defendant had not completed his intended theft at the time he shot the victim. Id. Although not stated explicitly, it is apparent that the Court of Criminal Appeals considered not only the timing of the events at issue, but the defendant's *intent* during his course of conduct. See also, e.g., Turner, 2012 WL 1077153, at *8 (holding that evidence was sufficient to support aggravated robbery conviction where the defendant "*began to demonstrate an intent* to deprive the owner of the property as he pushed the cart toward the [store] exit[,] [a]t which point, [an employee] confronted the [d]efendant. The [d]efendant then brandished a weapon, which enabled him to accomplish the 'taking' of merchandise by placing the employee in fear" (emphasis added)).

In the instant case, the Court of Criminal Appeals held that the proof supported the Defendant's especially aggravated robbery conviction on the basis that "the serious bodily injury suffered by the victim can precede, be contemporaneous with, *or occur subsequent to* but in connection with the taking of property of another." Henderson, 2016 WL 3390627, at *7 (emphasis added). In support of its holding, the intermediate appellate court cited to State v. Warfield, No. M2011-01235-CCA-R3-CD, 2012 WL 4841546, at *12 (Tenn. Crim. App. Oct. 5, 2012).

This language is problematic in at least two respects. First, nothing in the especially aggravated robbery statute supports the conclusion that the victim's serious bodily injury can be suffered "subsequent to" the commission of the underlying theft/robbery with a deadly weapon. Indeed, the language utilized by the Court of Criminal Appeals effectively adopts the continuous offense theory that the Owens Court rejected. See Owens, 20 S.W.3d at 640–41. As set forth above, the statutory text "where the victim suffers serious bodily injury" has been construed as requiring the injury to be suffered "during" the commission of the offense. Moreover, as we also note above, the definition of the word "where" as used in this manner is "in which." "In which" is not synonymous with "subsequent to."

Second, the Warfield case itself does not stand for the proposition that the victim may suffer his injuries "subsequent to" the completion of the underlying theft. In Warfield, the victim testified that he was shot after his two assailants entered his bedroom and told him, "[S]et it out, today's your day." 2012 WL 4841546, at *9. As the victim was trying to put on his pants, one of his assailants shot him. Id. The victim ran into the

11

bathroom, where he was shot a second time and lost consciousness. <u>Id.</u> at *10. He did not regain consciousness until he was in the hospital. <u>Id.</u> He testified that the cash that was taken from him had been in the pocket of some shorts that were on his bedroom floor. <u>Id.</u> at *9. Although the defendant presented proof that he and his accomplice robbed the victim outdoors and that his accomplice later went into the victim's home and shot the victim, the Court of Criminal Appeals correctly concluded that "the jury clearly accredited the testimony of the victim." <u>Id.</u> at *12. The victim's testimony clearly indicated that he was shot *before* his assailants took his money. Therefore, <u>Warfield</u> does not stand for the proposition that, in an especially aggravated robbery, the victim's serious bodily injury can be suffered "subsequent to" the underlying theft.

In sum, we hold that a robbery accomplished with a deadly weapon is complete once the accused has completed his theft of all the property he intended to steal. If the victim suffers serious bodily injury during the commission of the robbery, the offense may constitute especially aggravated robbery. It is appropriate to consider the accused's conduct and intent when determining whether the underlying theft has been completed.

Turning now to the facts of this case, the uncontroverted proof establishes that the Defendant demanded, by way of a gun, that Mr. Reed turn over his wallet, his cellphone, *and his keys*. After Mr. Reed had given the Defendant the requested property, the Defendant did not leave the scene. Rather, the Defendant began discussing with his cohort what to do with Mr. Reed. Keeping in mind our obligation to accord the State the strongest legitimate view of the evidence and all reasonable or legitimate inferences which we may draw from that evidence, we conclude that the Defendant's conduct in requesting Mr. Reed's keys, remaining on the scene, and demanding that Mr. Reed get in the trunk of his car support the inference that the Defendant intended to steal Mr. Reed's car. That is, the proof supports the inference that the Defendant had not completed his intended theft at the time Mr. Reed began to struggle with the Defendant, resulting in Mr. Reed being shot four times. Because the Defendant's conduct demonstrated that he had not completed his intended theft at the time Mr. Reed suffered his serious bodily injury, we hold that Mr. Reed suffered his serious bodily injury during the commission of the robbery with a deadly weapon. Accordingly, the evidence is sufficient to support the Defendant's conviction of especially aggravated robbery.

## Conclusion

Although we rely on different reasoning than that employed by our intermediate appellate court in this case, we affirm the judgment of the Court of Criminal Appeals. This matter is remanded to the trial court for further proceedings consistent with the Court of Criminal Appeals' opinion regarding the Defendant's consecutive sentencing.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

12