IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2018

**STATE OF TENNESSEE v. KEITH AUSTIN**

**Appeal from the Criminal Court for Shelby County**
**No. 15-02512       Chris Craft, Judge**

_____

**No. W2017-00927-CCA-R3-CD**

_____

A Shelby County Grand Jury indicted the Defendant, Keith Austin, for attempted first degree murder, aggravated assault, and employment of a firearm during the commission of a dangerous felony. After a jury trial, the Defendant was convicted of the lesser included offense of attempted second degree murder, aggravated assault, and employment of a firearm during the commission of a dangerous felony. The Defendant was sentenced to twenty-six years' incarceration as a Range II, multiple offender. On appeal, the Defendant contends that the evidence is insufficient to support his convictions of attempted second degree murder and employment of a firearm during the commission of a dangerous felony. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Stephen Bush, District Public Defender, and Phyllis Aluko (on appeal) and Jim Hale and Melody Dernoceour (at trial), Assistant Public Defenders, for the appellant, Keith Austin.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In an apparent fit of road rage, the Defendant pulled an AK-47 style weapon from his van and shot into the passenger side of the victim's semi-tractor trailer truck, striking him in both legs. The victim, Edwin Ray, a professional truck driver, survived, wrote down details of the Defendant's van, and called 911. By the time the police arrived, the

Defendant had sped away. He was apprehended days later. In his defense, the Defendant claimed he shot the victim to "send a message" and because the victim had a gun. The offense was described in detail at trial, the testimony of which we outline below.

On December 18, 2014, the date of the offense, around 3:00 or 4:00 p.m., the victim was driving his eighteen-wheeler, semi-tractor trailer truck north on Airways Boulevard toward Holmes Road in Memphis, Tennessee. At that intersection, he made a right turn onto Holmes Road when the Defendant, driving a minivan, pulled out in front of him. The victim "didn't even think [the incident] was a close call . . . [he] had the green light, so it was kind of unusual that the van would be in front of [him]." Even so, the Defendant stopped in the middle of the road and got out of the van claiming that the victim had almost hit him and his child. The victim said that the Defendant said, "I've got something for you," and gestured as if he was going back to the van. The victim did not respond. The Defendant got back in the van and drove off at a "high rate of speed." The victim anticipated the Defendant might report him to his employer and wrote down the Defendant's vehicle description and license plate number. He then put his truck in gear and drove off, thinking the incident was over.

The victim continued driving down Holmes Road towards Malone Road for about three miles. Before he reached Malone Road, he saw the Defendant at the intersection of Holmes Road and Getwell Road. As the victim approached the intersection, he was in the middle lane and the Defendant was in the far right turning lane. The victim could see the Defendant from his vantage point in the truck. He explained that the seat of the truck sat about six feet in the air and the truck and trailer were about thirteen-and-a-half feet high and over sixty feet long. As the victim looked down from his seat at the Defendant, the Defendant looked up and was "mean muggin' . . . [had] a grimace on his face."

As the victim and the Defendant continued through the intersection of Holmes Road and Getwell Road, they reached the intersection of Holmes Road and Malone Road. The victim pulled to the stop sign of the intersection, and the Defendant was sitting to the right of his truck in the turning lane as if he was turning south onto Malone Road. At that point, the van was stopped but never turned. The victim observed the van's brake lights were not on and thought the van had quit running. He waited for his turn at the four-way stop and as he began driving through the intersection, he heard a loud bang and "instantly noticed that [he] was bleeding." The victim had been shot in both legs. He turned and saw the Defendant get back in the van and drive off. The victim managed to stop the truck, administer first aid, and call 911. The victim testified that an ambulance arrived on scene and transported him to Regional One Med where he underwent surgery for a broken femur. The Defendant's bullet had entered through the passenger side of the truck cab, passed through both of his legs, hit the driver's side door, and ricocheted into a booklet located in the cab.

- 2 -

On cross-examination, the victim denied speaking to the Defendant during the altercation at the intersection of Airways Boulevard and Holmes Road. He said he never told the Defendant to get back in his truck or threatened him in any way. The victim acknowledged that he owned a gun and had a carry permit but denied having one in his truck because it was against his employer's policy. The victim conceded that officers searched his truck after the offense; however, they did not recover a gun.

On the day of the offense, Minnie Moody was travelling home from work. She left her office at Airways Boulevard and McAllister around 4:30 p.m. and began driving down Holmes Road. As she got to the intersection of Holmes Road and Tchulahoma Road, she noticed the Defendant's van being driven "sporadically, or erratically." At that point, she made eye contact with the Defendant as he drove past her. As she reached the intersection of Holmes Road and Malone Road, the Defendant was on the right side of her car, in the turning lane. She noticed an eighteen-wheeler truck behind her at the intersection. She again made eye contact with the Defendant, but he put his head down. She began driving through the intersection; she said she "didn't go any further, because it just seemed strange to [her], so [she] stopped . . . because [the Defendant] never moved." The Defendant was in the turning lane but never turned. As she was driving through the intersection, she heard a "pop," looked in her rearview mirror, and saw the Defendant get back in his van and drive off. She saw the eighteen-wheeler veer off on the side of the road, into oncoming traffic. She immediately called her husband and then called the police. She did not see the Defendant with a gun.

Alicia Graham, another eyewitness, testified that she left her office on Lamar Avenue around 3:30 p.m. on the day of the offense. She took Malone Road going south into Mississippi from Shelby County. As she arrived at the intersection of Holmes Road and Malone Road, she noticed that an eighteen-wheeler, going east on Holmes Road, arrived at the same time. She also noticed a minivan to the right of the eighteen-wheeler. She testified that she saw "an individual [get] out of that minivan, pull[] a rifle up and [shoot] into the [] truck.

She testified that as she pulled through the intersection, she looked in her rearview mirror. She saw the van pull in behind her and the eighteen-wheeler continue through the intersection going east on Holmes Road. She said she pulled over to get out of the van's way. As the van sped past her, she called the Memphis Police Department. Graham described the weapon that she saw the Defendant use as "a rifle of some sort." According to her, the Defendant "put it up against his arm and [she] [knew] it had a long barrel on it . . . ." She said the Defendant's feet were on the ground as he "raised" his gun to shoot the truck. On cross-examination, she confirmed that the Defendant was holding the gun on his left shoulder at about a forty-five degree angle, aiming at the

truck. On redirect, she stated that the Defendant was pointing the gun toward "the passenger seat, passenger's door."

Keshia James, the Defendant's girlfriend, testified that during December 2014, she owned a Ford Expedition and a Chrysler van. James testified that she usually drove the expedition, while the Defendant drove the van. She said on the day of the offense, she did not drive the van nor was she riding in the van.

Officer Cedric Foster of the Memphis Police Department was one of the first responding officers to arrive on the scene. Upon his arrival, he observed the eighteen-wheeler truck, looked inside the cab of the truck, and noticed the driver sitting in the driver's seat, bleeding from both legs. He did not notice any weapons inside of the truck. He was on the scene for about two hours and during that time no one was arrested. Officer Matthew Wheeler of the Memphis Police Department testified that he received a call about two weeks after the offense that the missing van involved in the shooting had been located. He identified the van by the license plate and VIN number. The van was retrieved from the Foote Homes Project in the area of Danny Thomas Boulevard. Officer Wheeler had a wrecker take the van from the Foote Homes Project to the Memphis Police Department city lot for evidence processing.

Officer Sam Blue, a crime scene investigator with the Memphis Police Department, testified that he responded to the scene, took pictures, collected evidence, and filled out a report documenting all of his information. Officer Blue testified that he recovered a cartridge casing on the road at the intersection and a bullet projectile in a little map pocket inside the truck's cab door. He did not find any weapons in the truck. Officer Stacy Milligan, another crime scene investigator with the Memphis Police Department, testified that he processed the Defendant's vehicle after the offense. He did not find a gun or an AK-47. On cross-examination, he admitted that a gunshot residue test was never performed on the van. Officer Walter Everhart of the Memphis Police Department tried to locate the Defendant on the night of the offense. He went to an address on Rendezvous Lane that the van was registered to but did not find the van or the Defendant. He spoke to the owner of the van, a female.

Agent Cervinia Brasswell of the Tennessee Bureau of Investigation was qualified as an expert witness in the field of firearms identification. She testified that she analyzed the cartridge case and bullet collected by Officer Blue. Based on her expertise, she determined that the bullet and cartridge were used with an AK-47 or SKS type rifle. On cross-examination, she admitted that an AK-47 or SKS type rifle functioned as an automatic or semi-automatic gun. She said that so long as the trigger was held down and the weapon was loaded, it would continuously fire. Agent Braswell also testified that if the weapon was set to fully automatic, then the weapon would have a recoil once it was

- 4 -

shot. In other words, the gun could have muzzle rise and the recoil would cause the muzzle to climb. On redirect, she said that even if the trigger was being continuously held down and the gun was loaded, it might not fire if it was jammed. On recross, she said from her analysis, she could not tell if the weapon jammed or not.

The Defendant testified that on the day of the offense, he took his daughter to school. He then went to work on a house that he had been painting and to KIA on Covington Pike. While he was at KIA, he received a call from his cousin, asking the Defendant to go pick up some of his cousin's belongings from an ex-girlfriend's house. The Defendant drove to The Warren Apartments and picked up his cousin's clothes, a large speaker, and a rifle wrapped in a sheet. The Defendant testified that he knew the rifle was an assault rifle based on what his cousin told him. He also said he knew the gun was loaded or "had one in the chamber." He placed the belongings in the far back of the minivan he was driving and drove back to Whitehaven Elementary to pick up his daughter. Once the Defendant picked up the child, he began driving back home.

The Defendant drove down Elvis Presley Boulevard to Holmes Road. He made a left turn onto Holmes Road going east. As he approached the intersection of Airways Boulevard and Holmes Road, he said he was "coming through the green light and a big eighteen[-]wheeler . . . truck, swerved to make a right turn [onto] Holmes, off of Airways." To avoid a collision, the Defendant swerved into oncoming traffic. The incident made the Defendant "mad and angry." The Defendant said he got back in the correct lane, got out of his van, and walked up to the truck. He told the truck driver, "man you're on that phone and ain't [sic] paying attention to the light, you done [sic] ran this light . . . man you could have killed us." The Defendant testified that he never told the victim that he "[had] something for [him]." According to the Defendant, the victim opened the truck door and had a weapon, either a ".380, or a nine-millimeter handgun" and said, "if you don't get back in that van I am going to shoot you in front of your daughter." This made the Defendant "scared" and "mad." The Defendant said he never reached into the van or acted as if he was taking anything out of it.

The Defendant got back into the van and continued down Holmes Road. He crossed Swinnea Road, made a right on Zodiac Park, and made a left onto Rendezvous Lane to drop off his daughter at his house. After he dropped off his child, the Defendant got back on Holmes Road and continued east. The Defendant testified that he saw the victim again at the intersection of Holmes Road and Getwell Road. He pulled next to the truck and made eye contact with the victim. He said he looked at the victim "basically, to get an apology[] or something . . . at least, I'm sorry." He said the victim looked at him like, "it's you again? You back, it's you, again?"

The Defendant said he continued down Holmes Road until he reached the intersection of Holmes Road and Malone Road. The Defendant testified consistently with the victim and the eyewitnesses as to the direction in which he was located at the intersection. He said the victim did not come up on his van immediately at the stop sign, and he did not recall making eye contact with anyone else at the stop sign. The Defendant sat at the stop sign and waited for the victim's truck to approach. The Defendant then testified that he went over the first seat of the van, past the second and third rows, and grabbed his cousin's rifle. He unwrapped the rifle from the sheet and returned to the driver's seat of the van. The Defendant said he wanted to send the victim "a message." He said, "if I [shot] his truck, [Ray] [would] have to answer to his employer and then they [would] know and why do you have a bullet hole in your truck, you must have [done] something to somebody . . . ." The Defendant sat with the gun in his lap as the victim arrived at the stop sign, intending to "shoot the engine" of the truck. He opened the van door, leaned with the gun, looked back down to take the safety off the gun, and shot one time. The Defendant said he took his hand off the trigger after one shot. According to him, he was never outside the van at any time. He said he could not open his door wide or exit the van because the victim's truck took up the entire lane, and there was not enough room. The Defendant testified that he shot at the truck because the victim "had a gun."

After the shooting, the Defendant continued down Malone Road to Stateline Road. He went back to the house he was painting and hid the gun in a shed. He said he did not realize he shot the driver of the truck until a friend called him several hours later and told him that a truck driver had been shot by the Defendant's house. Once he heard that, he went back and got the gun and threw it in the Mississippi River. He then went to a friend's house and put the van behind the house and left the keys there. He called someone to come pick him up.

On cross-examination, the Defendant admitted that after he dropped off his child, if he were returning to the house he was painting, he would have turned left onto Malone Road. Instead, he turned right toward the victim's truck. He also admitted that he had a baseball bat in the car but decided to use the gun to damage the truck instead because the victim "had a gun."

At the conclusion of the Defendant's testimony, the jury convicted him of attempted second degree murder, aggravated assault, and employment of a firearm during the commission of a dangerous felony, for which he received an effective sentence of twenty-six years' imprisonment. The trial court subsequently denied the Defendant's motion for new trial based on insufficient evidence, and it is from this order that the Defendant now timely appeals.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence regarding his convictions for attempted second degree murder and employment of a firearm during the commission of a dangerous felony. The State contends, and we agree, that the evidence was sufficient to support both convictions.

We apply the following well-established principles and rules in resolving this issue. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2006). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

Attempted second degree murder, therefore, requires the State to prove that a defendant acted with the intent to knowingly kill another and took a substantial step toward doing so. It is a Class C felony offense to employ a firearm during the commission of or attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1)-(2), (h)(1) (Supp. 2012); State v. Antonio Henderson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627, at *9 (Tenn. Crim. App. June 10, 2016), appeal granted (Oct. 24, 2016), aff'd, 531 S.W.3d 687 (Tenn. 2017). Attempted second degree murder is defined as a dangerous felony pursuant to Code section 39-17-1324. Id. § 39-17-1324(i)(1)(B).

The Defendant argues that the evidence presented at trial was insufficient to support his convictions of attempted second degree murder and employment of a firearm during the commission of a dangerous felony. He specifically contends that the evidence does not establish that he knowingly attempted to kill the victim. Further, the Defendant argues that since the evidence is insufficient to support the underlying dangerous felony conviction, the evidence is also insufficient to support the employment conviction. We disagree.

Taken in the light most favorable to the State, the proof at trial showed that at some point the victim and the Defendant encountered each other in traffic. This made the Defendant mad and angry, so much so that he got out of his van and confronted the victim. After the confrontation, the Defendant went home and dropped off his daughter. He got back into the van and drove in the direction of the victim's truck. The Defendant stopped at the intersection of Holmes Road and Malone Road, got out of his van, raised an assault weapon style rifle, and fired into the passenger side door of the victim's eighteen-wheeler, semi-tractor trailer truck. The victim was seated inside the truck and was visible at the time of the shooting. In attacking the mens rea element of the offense, the Defendant argues that he was trying to send the victim a message by only shooting the engine of the truck. Alternatively, the Defendant argues that he should have been convicted of voluntary manslaughter, not attempted second degree murder. He argues that he shot at the victim in a state of passion produced by adequate provocation. These arguments were presented to and rejected by the jury, as was its prerogative, and this court does not reweigh or re-evaluate the evidence.

Additionally, the Defendant argues that one bullet hole is not indicative of his intent to kill. In our view, the bullet hole coupled with the aforementioned proof was sufficient to establish that the Defendant was aware that his conduct was reasonably certain to cause the result. See State v. Ronald Turner, No. E2016-00651-CCA-R3-CD, 2017 WL 1830106, at * 10 (Tenn. Crim. App. May 5, 2017), perm. app. denied (Apr. 19, 2018) (concluding that firing one shot through a glass door was not sufficient to convict the defendant of attempted second degree murder of three victims, but was sufficient to convict him of attempted second degree murder of one victim). Accordingly, any

rational juror could have concluded that the Defendant intentionally engaged in conduct that would have, if completed, resulted in the knowing killing of the victim. <u>State v. Palmer,</u> 10 S.W.3d 638, 645 (Tenn. Crim. App. 2000). Because the Defendant's challenge to the sufficiency of the evidence supporting the underlying conviction of employing a firearm during the commission of a dangerous felony hinges entirely on the sufficiency of the attempted second degree murder conviction, we likewise conclude that the evidence is sufficient to support that conviction. He is not entitled to relief.

## CONCLUSION

Based upon the foregoing reasoning and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE