IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2017 Session

**STATE OF TENNESSEE v. LARRY E. OROZCO**

**Appeal from the Circuit Court for Rutherford County**
**No. F-72737B       Paul G. Summers, Senior Judge**

_____

**No. M2017-00327-CCA-R3-CD**

_____

The Defendant, Larry E. Orozco, was convicted of two counts of attempted second degree murder, two counts of unlawful employment of a firearm during an attempt to commit a dangerous felony, and seven counts of reckless endangerment committed with a deadly weapon. The trial court sentenced him as a Range I, standard offender to an effective term of thirty-one years' imprisonment. On appeal, the Defendant argues that (1) the trial court erred in admitting certain evidence in violation of Tennessee Rules of Evidence 403 and 404(b); (2) the evidence was insufficient to sustain his convictions; and (3) his sentence was erroneous and excessive. After a thorough review of the record and briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. NORMA MCGEE OGLE, J., filed a concurring in part and dissenting in part opinion.

W. Scott Kimberly, Murfreesboro, Tennessee, for the Defendant-Appellant, Larry Estrella Orozco.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Jennings H. Jones, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On September 6, 2014, as the Chavez family held a family party in their backyard, the Defendant and his accomplice walked up and threatened to rob Rene Chavez, Sr. When Mr. Chavez, Sr. saw the Defendant reaching for a gun, he attempted to defend

himself by punching the Defendant. The Defendant and his accomplice began shooting at the party attendees, severely wounding Mr. Chavez, Sr. and his son. The Defendant and his accomplice then fled to the apartments across the street until the police extricated the Defendant and recovered the two guns used in the shooting shortly after. That same evening, three eyewitnesses from the party positively identified the Defendant as one of the shooters. The Defendant and his co-defendant, Aaron Jamar McKee, were subsequently indicted for two counts of attempted first degree murder, two counts of employing a firearm during the commission of a dangerous felony, and fifteen counts of reckless endangerment.[1]

**Trial.** Rene Chavez, Sr., eyewitness and named victim in counts 2 and 4, testified that, on the night of September 6, 2014, he was hosting a family party at his home on Rock Springs Road when the Defendant and his accomplice approached the party. He described the Defendant as wearing jeans, a light blue shirt, white sneakers, and a black cap with "SWAT" written on it. He said that the Defendant tried to rob him and reached for what looked like the butt of a gun under his t-shirt. At that moment, Chavez, Sr. punched the Defendant in the face, and the Defendant fell to the ground. After Chavez, Sr. turned around, he felt a gunshot in his back, which he believed came from the Defendant's accomplice because the Defendant was still on the ground. He said the accomplice also shot his son three times. He said when the Defendant got up, he and his accomplice ran towards the street, and Chavez, Sr. heard "[s]ix, seven, perhaps ten gunshots more." He observed the Defendant and his accomplice run towards Colony Square Apartments across the street from his home. He identified exhibit 1 as the photographic lineup in which he identified the Defendant as the man who tried to rob him the night of the shooting. He identified exhibit 2 as an aerial view of his home and pointed to where he was standing when confronted by the Defendant and his accomplice. On cross-examination, Chavez, Sr. confirmed that he did not see the Defendant shoot his gun at anyone, but he heard gunshots after the Defendant got up and started running.

Rene Chavez, Jr., eyewitness and named victim in counts 1 and 3, testified that he was standing with Cedric Maldonado, Roberto Aguilar, the named minor victim in count 11, and others when he saw two strangers approach his father, Rene Chavez, Sr. He described the Defendant as wearing a light blue sweatshirt and a dark colored cap. When he and Maldonado walked over to Chavez, Sr., he testified that he saw the Defendant lift his shirt and reach for something and then saw his father punch the Defendant. At that moment, the accomplice pulled out his gun and shot Chavez, Jr. in the knee. As he

---

[1] The Defendant filed a motion to sever his case from his co-defendant's, which was granted by the trial court. The trial court also granted the State's pre-trial motion to amend the indictment to delete the word premeditation in counts one and two, effectively reducing the attempted first degree murder charges to attempted second degree murder. The State's motion to dismiss seven counts of reckless endangerment previously included in the indictment was also granted.

dragged himself to the grass, he heard more gunshots, turned around, and saw the Defendant standing up and shooting at him and Maldonado. Chavez, Jr. testified that he was shot a total of three times: in the knee, legs, and back, and that he believed the final shot that hit him was fired by the Defendant. He identified exhibit 3 as the photographic lineup in which he identified the Defendant as one of the men who shot him.

On cross-examination, Chavez, Jr. confirmed that he had previously testified about the shooting in a preliminary hearing and stated that he did not remember anything after being shot and only heard gunshots. At trial, Chavez, Jr. clarified that his answer differed because he was scared. On redirect, Chavez Jr. confirmed that his testimony at trial was the truth.

Misty Lowe testified, over the Defendant's objection, that she was standing outside her apartment at Colony Square Apartments, Building E, when she heard gunshots coming from across the street, Rock Springs Road. She took her children inside and when she came back outside, she saw the Defendant and his accomplice running towards her from the same direction as the gunshots. As the Defendant approached her, she saw a gun in his waistband which he removed and pushed against her stomach. The Defendant's accomplice intervened and both men ran to an upstairs apartment in the building. Lowe identified exhibit 4 as a photograph of her apartment building and indicated with an "L" where she was standing when the Defendant approached her.

Cedric Maldonado, eyewitness and father of the named minor victim in count 5, testified that he was standing with Chavez, Jr. and several of the minor victims when they saw two strangers approach Chavez, Sr. He described the Defendant as wearing a light blue t-shirt, a black cap, and white sneakers. As he and Chavez, Jr. approached the three men, he saw the Defendant fall to the ground when his accomplice pulled out a gun and started shooting at Chavez, Sr. and Chavez, Jr. After Chavez, Jr. was shot the first time, Maldonado jumped to the grass with him to try to protect them. When he looked up, he saw the Defendant shooting at him and Chavez, Jr. He then saw the Defendant and his accomplice run towards Colony Square Apartments across the street and indicated the specific direction on exhibit 2. Maldonado testified that there were several children at the party, playing in the backyard, and with their parents in the cars getting ready to leave. After the shooting, he said he noticed several bullet holes in those cars, including a bullet hole "about [five] or [six] inches above" where one of the minor victims was seated. Later that evening, he participated in a show up during which he identified the Defendant as the man who shot at him and Chavez, Jr. He then identified exhibit 5 as the photographic lineup in which he identified the Defendant as the shooter.

On cross-examination, Maldonado testified that he is still friends with Chavez, Jr., but that they had not discussed their testimony or the shooting since that night. He

clarified that the Defendant stood up after he fell down and started "shooting at [him and Chavez, Jr.] with that gun trying to kill" them "more than three or four times."

Karin Orizabal testified that she was Cedric Maldonado's wife and the mother of the named minor victim in count 5. She was placing her child in the car and preparing to leave the party, when she noticed two strangers walking up the driveway. She saw Chavez, Sr. speaking with the two men and saw her husband and Chavez, Jr. walk up to them. All of a sudden, she heard gunshots and then grabbed her daughter to protect her. She saw the Defendant "shooting as if he were shooting up in the air" and that both the Defendant and his accomplice were "just shooting and shooting away."

On cross-examination, Orizabal clarified that she jumped into the car to protect her child and watched the rest of the shooting through her car window. She and her husband have remained friends with Chavez, Jr. since that night. She confirmed that, since that night, she had discussed the shooting with her husband and Chavez, Jr., and that she had seen her husband and Chavez, Jr. discuss the shooting together.

Sergeant Patrick Mangrum of the Smyrna Police Department testified that he responded to the shooting on Rock Springs Road on September 6, 2014. He learned that the shooters fled on foot into the Colony Square Apartments across the street. He called Officer Jacobs to process the crime scene and Detective Monroe to lead the investigation. He also called the tactical team to Colony Square Apartments where the shooters were ultimately found.

Herod Castro, eyewitness and father of the named minor victim in count 6, testified that he saw two strangers approach the party and saw the Defendant speaking to Chavez, Sr. He described the Defendant as wearing jeans, a light blue t-shirt, a cap, and white shoes. He saw the Defendant fall down and then his accomplice pulled out his gun and started shooting at Chavez, Sr. He then saw the Defendant stand up, pull out his gun, and shoot "more than two or three shots" at Chavez, Jr. and Maldonado. He said the Defendant and his accomplice started to run away towards the apartments, but then they "started shooting towards all of us," including the children. Later that evening, he participated in a show up during which he identified the Defendant as the man who shot at Chavez, Jr. and noted that the Defendant was wearing different clothing than at the shooting. He identified exhibit 6 as the photographic lineup in which he identified the Defendant as the shooter.

On cross-examination, Castro clarified that when the shooting started, he ran towards his wife and daughter, made sure they were safe in the house, and then came back to the yard where he "saw them firing towards the cars and the children." He affirmed that he gave a written statement the night of the shooting that did not mention

- 4 -

the Defendant, but clarified that he was very nervous and was not "in a very good state of mind to be making statements[.]" He testified that he was telling the truth. He also confirmed that he was still friends with Chavez, Jr. and Maldonado, but stated that they only discussed the shooting "with the authorities."

Denise Cordova, mother of the named minor victims in counts 9 and 10, testified that she was in her car with her kids preparing to leave when she saw two strangers walk past her and towards Chavez, Sr. She then heard gunshots, grabbed her children, and laid on the floor of the car. She said she heard an "explosion" when one of the gunshots shattered her window and that another shot hit approximately five inches above her daughter's head. On cross-examination, Cordova confirmed that she did not witness the actual shooting because she kept her head down the whole time.

Roberto Aguilar, eyewitness and father and uncle to the named minor victims in counts 7 and 8, respectively, testified that he was talking to Chavez, Sr. when two strangers walked up to them. He described the Defendant as wearing a light blue shirt, blue jeans, white shoes, and a black cap with letters "like swap or swat[.]" He saw Chavez, Sr. walk the Defendant and his accomplice off the property while he stayed back with his sister, wife, and children. He then heard gunshots, tried to find cover behind the grill, and lifted his head to see the shooting. He testified that he saw the Defendant "shooting at all of the cars and all of the people[,]" including the car in which his mother was sitting. He then saw the two men run across the street toward Colony Square Apartments. Later that night, he participated in a show up during which he identified the Defendant as the shooter, noting that he was wearing different clothing from the shooting. He identified exhibit 7 as the photographic lineup given to him in which he identified the Defendant as the shooter. He testified that he also gave a written statement that night but was very nervous when he did so.

On cross-examination, Aguilar testified that he did not see Chavez, Sr. "touch, hit, [or] push" the Defendant and did not see the Defendant fall. He confirmed that he previously testified in a preliminary hearing that he saw Chavez, Sr. attempt to hit the Defendant in the face, but explained that any difference in testimony was because he was very nervous.

Leslie Meza, Aguilar's wife and the mother and aunt of the named minor victims in counts 7 and 8, respectively, testified that she was putting her children in the car and preparing to leave when she saw two strangers approaching the party. She described the Defendant as wearing jeans, a baby blue shirt, and a hat that said "SWAT." She saw Chavez, Sr. escort the Defendant away from the property when the shooting started. Although she did not see the shooters because she was hiding inside her car, she saw two strangers run toward Colony Square Apartments across the street. She peeked through

her window and saw the shooters "shooting like towards everybody . . . they w[ere] just like shooting like they didn't care who was there."

On cross-examination, Meza confirmed that she did not participate in the show up or photographic lineup identification, but she did give a written statement that night. On re-cross, she explained that her statement did not include specific details of the shooting and fleeing because she was trying to describe the people she saw and not necessarily what happened. She further clarified that she saw the Defendant when he walked past her towards Chavez, Sr., but could not affirmatively testify as to whether he was one of the shooters because she did not actually see them.

Detective John Mitchell of the Smyrna Police Department testified that he responded to the shooting and assisted Officer Robert Jacobs in investigating Apartment E-16 at the Colony Square Apartments. He identified exhibits 8 and 9 as the two guns he found in the back of a toilet inside that apartment the night of the shooting.

Detective Robert Monroe of the Smyrna Police Department responded to the shooting and assisted Sergeant Mangrum in the investigation. He testified that, after the SWAT team extricated the Defendant from Apartment E-16 of the Colony Square Apartments, he performed a show up of the Defendant with several eyewitnesses from the shooting who positively identified him as the shooter. He identified exhibits 1, 3, 5, 6, and 7 as the photographic line-ups he gave to Chavez, Sr., Chavez, Jr., Maldonado, Castro, and Aguilar, respectively. He testified that he searched Apartment E-16 and recovered two guns in the back of one of the toilets. He identified exhibit 10 as the blue and white NIKE cap and blue and white tennis shoes belonging to the Defendant that were recovered during the apartment search, and matched them to the Defendant's clothing in photos on his phone taken the night of the shooting. He later recovered the Defendant's cell phone, obtained a search warrant, and found over 100 photos and videos depicting guns, the Defendant holding guns, and the Defendant holding the very guns used in the shooting.

Detective Monroe then identified and the State admitted exhibits 11, 12 and 13 into evidence. Exhibit 11 depicted the two guns used in the shooting. Exhibit 12 contained two photos: the top depicted the Defendant and another individual holding guns and the bottom depicted one gun and two magazines. Exhibit 13 depicted the Defendant pointing two guns at the camera. Detective Monroe testified that, although he could not determine the make of the guns in exhibit 13 based on their barrels alone, the gun in the Defendant's left hand was similar to the guns used in the shooting. He then identified exhibit 14 as two photos depicting the Chavez property taken from the vantage point of Colony Square Apartments. He testified that he also reviewed a security video taken outside the Chavez home the night of the shooting and identified who he believed

to be the Defendant walking up the driveway and back down with Chavez, Sr. He stated that they walked out of frame and that the actual shooting was not captured on camera. On cross-examination, Detective Monroe clarified that he also conducted a photographic lineup with Orizabal but that she was unable to identify the Defendant as the shooter.

Officer Robert Jacobs of the Smyrna Police Department processed the scene after the shooting. He identified exhibit 15 as the rendered drawing of the scene, the evidence placard log, and the distance measurements log he created from the night of the shooting. He said that three cars were struck by bullets and that two groupings of shell casings were found on the scene. He identified exhibits 16 through 27 as the twelve shell casings he collected from the scene which were further identified by placards in the evidence logs. On cross-examination, he identified exhibits 28 through 31 as additional photographs taken of the crime scene on the night of the shooting.

Laura Hodge, Special Agent Forensic Scientist of the Tennessee Bureau of Investigation, was tendered an expert in ballistics and firearm technology. She examined the two guns used in the shooting, exhibits 8 and 9, and compared test fired bullets from both guns with the shell casings retrieved from the crime scene. She determined that the shell casings in exhibits 16 through 24 were shot from exhibit 9, that exhibits 25 and 26 were shot from exhibit 8, and that exhibit 27 could have been fired from either exhibit 8 or 9. She identified exhibit 3 as her Official Firearms Report containing her examination in full.

The Defendant offered no proof. He was convicted as charged and later received an effective sentence of thirty-one years imprisonment. He filed a motion for new trial on April 14, 2016, which was denied by written order on December 21, 2016. He then filed a timely notice of appeal on January 10, 2017.

## ANALYSIS

**I. Evidence Governed by Rules 403 and 404(b).** The Defendant argues the trial court erred in admitting certain evidence in violation of Rules 403 and 404(b) of the Tennessee Rules of Evidence. We will therefore apply the following legal rubric and address each evidentiary item in turn.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy absent an abuse of discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

Rule 404(b) prohibits admission of evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character except when it may be relevant to the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See Tenn. R. Evid. 404(a); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). Evidence of other crimes, wrongs, or bad acts may be admissible for these purposes if the following conditions outlined in Rule 404(b) are met:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Appellate review of a trial court's admission of evidence governed by Rule 404(b) is for an abuse of discretion so long as the trial court substantially complies with the above requirements. Otherwise, our review is de novo. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The admissibility of photographs is also within the sound discretion of the trial court and reviewed only for an abuse of discretion. State v. Odom, 336 S.W.3d 541, 565 (Tenn. 2011) (citing Banks, 564 S.W.2d at 949). A photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Banks, 564 S.W.2d at 949. In addition, a photograph must be relevant to an issue in dispute. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951). A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

**A. Admission of Misty Lowe's testimony.** The Defendant argues that the trial court violated Rule 404(b) by admitting the following testimony of Misty Lowe: that the Defendant drew a gun on her and stuck it in her stomach. The Defendant insists the trial court failed to determine that a material issue existed other than conduct conforming with a character trait, failed to state on the record the material issue or the reasons for admitting the evidence; and failed to find proof of the other crime, wrong, or act to be clear and convincing. In response, the State contends the trial court complied with the requirements of Rule 404(b) and properly admitted the testimony of Misty Lowe because it established the Defendant's "nefarious intent" and that he was "acting with malice." The State further offered Lowe's testimony to rebut the Defendant's "heat of passion" defense after Chavez Sr. knocked him down.

Prior to Misty Lowe's testimony and outside the presence of the jury, defense counsel objected based on Rule 404(b) arguing that testimony concerning "a gun being shoved in [her] stomach at some point during the exchange" amounted to a prior bad act. After hearing arguments from the parties, the trial court summarily overruled the objection. Misty Lowe began to testify but before she was asked the penultimate question the trial court took another break outside the presence of the jury to place its 404(b) analysis on the record:

> The Court finds that the probative value is that assuming that testimony comes out, as I think it's going to, the probative value is that it shows recklessness. It shows nefarious intent. It shows malice. It also shows wanton disregard for life or property for that matter. And, furthermore, it appears that it was all part of a continuum that only happened maybe seconds, maybe even a few minutes after the original shooting.
>
> The Court feels like this prejudice is far outweighed by the probative value particularly.

Despite the Defendant's arguments to the contrary, the record shows that the trial court substantially complied with Rule 404(b)'s procedural requirements; therefore, we review for an abuse of discretion. Although the trial court did not explicitly state that proof of the other crimes, wrongs, or acts was "clear and convincing," the record established that the Defendant was the individual who stuck a gun in Lowe's stomach. In addition, defense counsel had no objection to limiting Lowe's testimony to "[the Defendant] had a gun and she [knew] he had a gun when he came around the corner."

Moreover, defense counsel's argument focused solely on the unfair prejudicial effect of the evidence, rather than whether it occurred. See State v. Clark, 452 S.W.3d 268, 291 (Tenn. 2014) (holding that although the trial court did not expressly state that the evidence of the defendant's pornography use was "clear and convincing," this procedural requirement was met because the defendant admitted using pornography throughout the investigation and trial); State v. Ray Anthony Nelson, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App., Knoxville, Sept. 9, 1998) (stating that the trial court substantially complied with Rule 404(b) when it met all the requirements of the rule except the need to make a clear and convincing evidence determination and the record established that there was "no real question" that the alleged events occurred); see also State v. Jones, 450 S.W.3d 866, 892 (Tenn. 2014) (The clear and convincing evidence standard mandates that there be no serious or substantial doubt about the correctness of the conclusions drawn from the evidence). Accordingly, we conclude that the trial court substantially complied with the procedure in Rule 404(b).

Based on our review, we conclude that the probative value of Misty Lowe's testimony outweighed any prejudicial effect. Lowe testified that directly after she heard gunshots, she took her children inside her apartment and returned outside to determine if anyone was hurt. Upon her return, she was approached by the Defendant, who stuck a gun in her stomach. He did not remove the gun until his accomplice approached and said Lowe was not "the one." The two men continued up the stairs of the complex to another apartment, where the Defendant was eventually arrested. Admission of this testimony was probative of the steps the Defendant took to effectuate his escape or flight from the instant offense, which further evinces his consciousness of guilt. We also agree with the State that this evidence rebuts any inference by the Defendant that he was acting in the "heat of passion" after Chavez, Sr. struck him. Discerning no abuse of discretion, we conclude that the trial court properly admitted the testimony of Misty Lowe.

**B. Admission of Photograph.** The Defendant next challenges the trial court's admission of exhibit 13, a photograph of the Defendant pointing two guns at the camera, based on Rules 403 and 404(b). He contends that the admission of the photograph violated Rule 403 because the reasons provided by the trial court were "an erroneous application of the law . . . unnecessarily cumulative . . . [or] previously established by other evidence." The Defendant specifically argues that Detective Monroe testified that the guns in exhibit 13 were not the same guns used in the shooting. Other than holding a hearing outside the presence of the jury, the Defendant argues that the trial court failed to comply with the Rule 404(b), entirely. He insists that exhibit 13 constitutes a prior bad act as contemplated by Rule 404(b) because it shows "the Defendant holding weapons pointed towards the camera in a menacing fashion and no material issue exists for its admission other than conduct conforming with a character trait." In response, the State

contends that exhibit 13 was properly admitted by the trial court. For the reasons that follow, we agree with the State.

Prior to Detective Monroe's testimony, the trial court addressed the Defendant's motion in limine to exclude certain photographs, specifically exhibit 13. The State explained that the Defendant's cell phone was recovered from him upon his arrest. A search warrant was obtained for the contents of the cell phone, which revealed hundreds of photographs, videos, and text messages. The State culled the photographs down to three and argued that each photograph was relevant based on (1) the Defendant's association and familiarity with guns prior to the instant offense, (2) the photographs showed guns that were similar to or the same as the guns used in the offense, and (3) the guns in the photographs were similar to or the same as the guns recovered from the toilet at the apartment where the Defendant was arrested. Defense counsel conceded that if the photographs illustrated the same guns as used in the offense, then "it would be incredibly probative." The State assured the trial court that it anticipated Detective Monroe to confirm its assertions. Defense counsel reserved the right, with the trial court's permission, to revisit the issue if the testimony did not bear out as contemplated by the State. In addition, defense counsel argued that it was difficult to determine the make of the firearms in exhibit 13 because only the barrels of the guns were visible. Even so, if the other photographs were in fact of the same guns used in the offense, exhibit 13 would be cumulative. Defense counsel was particularly concerned because the Defendant's appearance, "pants down around [his] ankles" and "sloppily dressed," encroached upon his previously granted motion to exclude any reference to gang affiliation. In denying the motion, the trial court engaged in an exhaustive analysis, the relevant portion of which is below:

> [Exhibit 13]'s probative value is the fact that, yes, there was testimony - - already been testimony that the person was sloppily . . . dressed. Clearly, the person in this photograph who appears to be [the Defendant] is sloppily dressed. If he chooses to be sloppily dressed, that's his business. But that sloppily dressed appearance won't come from some witness. It will come from the photograph that he apparently generated.
>
> He is pointing two weapons. It is unclear as to whether these are the same weapons, but they are as in photographs 1 and 2. But they are weapons that appear to be similar to. One clearly has an extended clip in its magazine. They are both clearly semi[-]automatic weapons.
>
> This was taken on his telephone. It was retrieved shortly after the incident in question in September. The probative value clearly outweighs any prejudice. Therefore, this photograph will be admitted.

Detective Monroe testified in part that, although he could not determine the make of the guns in exhibit 13 based on their barrels alone, the gun in the Defendant's left hand was similar to the guns used in the shooting. The Defendant renewed his motion to exclude exhibit 13, arguing that Detective Monroe did not confirm the identity of the guns in exhibit 13, as previously asserted by the State, and therefore, the guns had no probative value. In overruling the motion, the trial court found that the Defendant himself created any prejudice apparent in exhibit 13, that exhibit 13 depicts the Defendant's familiarity with guns similar to the one used in the shooting (with an extended magazine), that Detective Monroe testified that the gun could be the same gun as used in the offense, and that the probative value clearly outweighed any prejudice. After the trial court concluded its ruling, defense counsel added, without elaboration, "[t]here is a motion against the same evidence under 404(b) as evidence of prior bad acts." To which the trial court responded, "I'm overruling your motion as to the admissibility of this particular picture."

Upon our review, we discern no abuse of discretion by the trial court's admission of exhibit 13. The Defendant does not mount a credible challenge to the relevance of exhibit 13. Although Detective Monroe was unable to confirm that the guns in exhibit 13 were in fact the same guns used in the offense, he testified that one of them could have been because of the extended clip or magazine. There can be no genuine question that a photograph taken from the Defendant's cell phone shortly after the offense showing the Defendant in similar clothing as described by victims of the offense and brandishing a similar gun as used in the offense is probative of whether the Defendant possessed a gun during the offense. The Defendant's real argument is that the photograph was unfairly prejudicial and cumulative. We disagree. Exhibit 13 was neither prejudicial nor cumulative because it was the only photograph from the Defendant's cell phone admitted into evidence showing the Defendant actually holding the guns, which demonstrates the Defendant's familiarity with and dominion over the guns. The trial court properly denied the Defendant's motion to exclude exhibit 13 based on Rule 403. The Defendant is not entitled to relief on this issue.

Regarding the Defendant's Rule 404(b) argument, defense counsel filed over 30 pre-trial motions, including a non-specific "Motion for Disclosure under Evidence Rule 404(b)." During the above referenced motion in limine to exclude exhibit 13, the sole basis put forth to the trial court to exclude the photograph was Rule 403. When Detective Monroe testified, defense counsel renewed his objection to exhibit 13 based solely on the grounds previously articulated to the court, Rule 403. Only after exhibit 13 was admitted into evidence did defense counsel object based on Rule 404(b). Therefore, this issue is technically waived. Waiver notwithstanding, in his motion for new trial, the Defendant argued that exhibit 13 was admitted in violation of Rule 404(b). The trial court denied relief, applying similar reasoning for admission based on Rule 403. We likewise reject

- 12 -

Defendant's contention that exhibit 13 constitutes a prior bad act governed by Rule 404(b). See State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014) (holding that Rule 404(b) only applies to "bad acts"); State v. Reid, 213 S.W.3d 792, 813-14 (Tenn. 2006) ("Testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under Rule 404(b)"). Because possession of a handgun is not a "bad act" requiring the application of the Rule 404(b), the trial court did not err in admitting exhibit 13. See e.g., State v. Lamantez Desha Robinson, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *7 (Tenn. Crim. App. Oct. 18, 2017), appeal denied (Feb. 14, 2018). Accordingly, the Defendant is not entitled to relief.

**II.** **Sufficiency of the Evidence.** The Defendant challenges the sufficiency of the evidence regarding his convictions for attempted second degree murder and unlawful employment of a firearm during a dangerous felony. He does not contest the sufficiency of evidence for his reckless endangerment convictions. The State contends, and we agree, that the evidence is sufficient to support his convictions.

We apply the following well established principles and rules in resolving this issue. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and

- 13 -

the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). Attempted second degree murder, therefore, requires the State to prove that a defendant acted with the intent to knowingly kill another and took a substantial step toward doing so.

It is a Class C felony offense to employ a firearm during the commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1)-(2), (h)(1) (Supp. 2012); State v. Antonio Henderson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627, at *9 (Tenn. Crim. App. June 10, 2016), appeal granted (Oct. 24, 2016), aff'd, 531 S.W.3d 687 (Tenn. 2017). Attempted second degree murder is defined as a dangerous felony pursuant to Code section 39-17-1324. Id. § 39-17-1324(i)(1)(B). As we previously noted, second degree murder is the "knowing killing of another." Id. § 39-13-210(a)(1).

The Defendant argues that the evidence is insufficient to support his attempted second degree murder convictions. The Defendant specifically contends that the State's witnesses failed to provide an accurate account of the shooting and altered their testimony to fit a different version of events. He asserts that Chavez, Jr., Castro, and Meza all changed their testimonies from the written statements given after the shooting to preliminary hearings and trial by later including that they saw the Defendant shooting his gun. Rather than challenging any of the elements of attempted second degree murder, the Defendant essentially attacks the "inconsistencies in the testimony of the State's witnesses." Because the evidence was insufficient to support the attempted second degree murder convictions, the Defendant argues his convictions of employing a firearm during the commission of a dangerous felony are likewise infirm. In other words, the Defendant makes no independent argument challenging the evidence supporting his employing a firearm during the commission of a dangerous felony.

Taken in the light most favorable to the State, the proof at trial showed that the Defendant and his accomplice fired at least twelve shots at the victims. They hit Chavez, Jr. three times, Chavez, Sr. once, nearly missed other victims, and hit several cars parked nearby. The repetitive shooting demonstrates that the Defendant intentionally shot the victims with the knowledge that shooting them was reasonably certain to kill them. The

eyewitness testimony at trial, which was accredited by the jury, established that the Defendant possessed a gun during the commission of attempted second degree murder. It has long been the rule that any questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are resolved by the jury, not this Court. Bland, 958 S.W.2d at 659. Accordingly, the evidence was sufficient to support the Defendant's conviction for attempted second degree murder and unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony. The Defendant is not entitled to relief on this issue.

**III. Excessive and Erroneous Sentencing.** The Defendant argues that the trial court erred in sentencing him both in terms of length and its consecutive nature. The State argues that the Defendant waived this issue by not providing the transcript of the sentencing hearing in the appellate record. Nevertheless, the State argues that the trial court's sentencing was proper.

The State correctly observes that the Defendant failed to include the transcript of the sentencing hearing in the appellate record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)).

We are compelled to agree with the State and conclude that the Defendant has waived this issue by failing to include a transcript of the sentencing hearing in the record on appeal.[2] The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must

---

[2] Of concern to this court is the fact that this issue was raised in the State's brief and at oral argument, and there was no motion to supplement the record or attempt to rectify the problem.

- 15 -

presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Accordingly, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE