IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 19, 2018 Session

## STATE OF TENNESSEE v. KRISTEN L. VAN DE GEJUCHTE

**Appeal from the Criminal Court for Sumner County**
**No. 258-2016        Dee David Gay, Judge**

_____

### No. M2017-01173-CCA-R3-CD

_____

Defendant, Kristen L. Van De Gejuchte, appeals her conviction for driving under the influence. In her appeal, she contends that the evidence is insufficient to support her conviction and that the trial court erred by denying her motion to suppress. After a thorough review of the record and the applicable law, we conclude that the evidence is sufficient to support her conviction and that the trial court did not err. Therefore, we affirm the judgments of the trial court but remand for entry of a corrected judgment document for Count One reflecting its merger with Count Two.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Rob McKinney, Nashville, Tennessee, for the appellant, Kristen Lee Van De Gejuchte.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sidney Preston, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Factual and Procedural Background*

A Sumner County Grand Jury indicted Defendant for driving under the influence by impairment in Count One and driving under the influence per se in Count Two. The following facts were adduced at the bench trial on these charges.

On October 25, 2015, as John Pszenitzki sat on his deck at the Stoneridge Apartments at the Hunt Club, he heard tires squeal. He looked toward the source of the noise and saw a red Jeep Wrangler "half in, half out of a parking spot." The Jeep "lurched" forward a few times. Once the Jeep was turned off, Defendant exited the vehicle and began walking toward the other side of the apartment complex. According to Mr. Pszenitzki, it appeared as though Defendant fell behind some vehicles. Defendant got up and began walking again until she fell a second time. At that point, Mr. Pszenitzki heard the sound of somebody heaving, which Mr. Pszenitzki associated with someone vomiting. Defendant stood up, walked a short distance, and fell a third time. Defendant lay on the ground for ten to fifteen seconds before getting up and walking toward a different red vehicle. As Defendant approached the vehicle, she paused before entering the driver's side door.

When Defendant entered the red vehicle, Mr. Pszenitzki called Officer Jared Roach of the Gallatin Police Department, his roommate at the time. While on the phone, Mr. Pszenitzki told Officer Roach about the Defendant's actions and remained on the phone with him through the remainder of his observations. Defendant started the red vehicle, waited five to ten seconds, backed out of the parking spot, and headed out of the parking lot. Defendant drove through an adjacent parking lot before turning left on a side road. Mr. Pszenitzki lost sight of the red vehicle as it went behind a building, but he regained sight of the vehicle as it passed the building and headed toward the main entrance of the apartment complex. Before getting to the main entrance, Defendant turned around in another parking lot and drove away from the main entrance, back toward the area from which she came. At this point, Officer Roach entered through the main entrance of the apartment complex in his patrol car.

Officer Roach spotted Defendant's vehicle as she was turning around to drive away from the main gate. He identified the vehicle as a "red Mazda M3." Officer Roach used an emergency override to enter the main gate and pursued the vehicle. After catching up to the vehicle, Officer Roach activated his emergency equipment to initiate a stop of the vehicle. Officer Roach disclosed that he did not personally observe a traffic violation or public law violation before turning on the blue lights on his police car. As soon as Defendant stopped, she exited the vehicle. Officer Roach ordered her to reenter the vehicle for everyone's safety. Next, Officer Roach began to speak with Defendant, and Officer Brandon Troutt arrived to assist Officer Roach.

Upon speaking with Defendant, Officer Roach noticed her eyes were "watery and bloodshot." Officer Roach "smelled the odor of an intoxicating beverage emanating from inside her vehicle as well as her breath when she spoke[.]" He also heard Defendant slur heavily as she spoke. When Officer Roach asked Defendant to exit the vehicle to

perform field sobriety tests, she refused. He asked again. She refused. He ordered her to exit. She refused. Finally, Officers Roach and Troutt forcibly removed Defendant from the vehicle. Once removed, Defendant stood near the rear of the vehicle. She swayed and appeared unsteady. She made several "changing and incoherent statements." Defendant said she was not drunk and was not driving. She said she was walking, not driving. According to Defendant, she did not pull over. Rather, she walked over to the place where she stood. Next, she claimed that she was going to get lasagna from her garage. Officer Roach asked Defendant to perform field sobriety tests on multiple occasions, and each time she refused. At this point, Officer Roach placed Defendant under arrest for driving under the influence and read to her the Tennessee implied consent law. Officer Roach requested that Defendant submit to a blood test, and Defendant refused. In response, Officer Roach had Defendant transported to the Sumner County Jail to be held while he obtained a search warrant for Defendant's blood. After he assisted Officer Roach with Defendant, Officer Troutt went with Mr. Pszenitzki and took pictures of vomit in the location where Mr. Pszenitzki saw Defendant heaving.

Officer Roach obtained a search warrant and transported Defendant directly to Sumner Regional Hospital. Defendant's blood was drawn, and Officer Roach kept the sample in his custody until it was secured in his vehicle. After returning Defendant to the jail, Officer Roach completed the remaining paperwork for analysis of the blood sample and prepared the blood sample to be sent to the Tennessee Bureau of Investigation ("TBI").

At trial, Neil Toll, the evidence technician at the Gallatin Police Department, testified to the standard procedures for specimens received by his office. Evidence, like Defendant's blood sample, is placed in an evidence locker at the police station to which only the three evidence technicians have a key. With regard to Defendant's blood sample, Mr. Toll removed it from an evidence locker at 8:25 a.m. on October 26, 2016, and logged it into the computer system at 11:51 a.m. From that point, the evidence was securely stored in a box in Mr. Toll's office awaiting transport to the TBI laboratory. At 9:59 a.m. on October 29, 2016, Mr. Toll logged Defendant's sample out of the system and personally transported it to the TBI laboratory. At the TBI laboratory, Mr. Toll placed it in the drop box. Agent April Hagar of the TBI crime laboratory tested the blood sample obtained from Defendant. The test revealed a blood alcohol content of .215 grams percent.

The nature of the property on which Defendant was operating her vehicle was a central issue at trial. Mr. Pszenitzki said that the apartment complex has a main gate and a secondary gate, and Officer Roach recalled that the gates at the apartment complex did not work very well when they were first installed. The main gate is at the front of the apartment complex and opens to Nashville Pike. At the main gate, one must proceed

through an arm and a gate to enter the apartment complex. Residents have a "clicker" to open the arm and gate, but non-residents must either use a code or call a resident to let them in. The gate and arm at the main gate work "sometimes." According to Mr. Pszenitzki, the gates are usually open on the weekends and sometimes the gates are not even operational. When the gates did not work, they usually stayed open. In the afternoon, the main gate would be left open because of the influx of work traffic. However, Mr. Pszenitzki said that the secondary gate is always closed and may only be opened with a "clicker." Officer Roach recalled the complex having problems with "tailgating" and with residents giving extra "fobs" to guests. On cross-examination, Officer Roach admitted that the only ways to gain access to the apartment complex were to trespass, be in law-enforcement, be a resident, or be a resident's guest.

At the end of the bench trial, the trial court made an oral ruling. Based on the above facts, the trial court found, beyond a reasonable doubt, that Defendant was guilty of both driving under the influence by impairment and driving under the influence per se, which the trial court merged into a single conviction. In addition to those findings, the trial court found beyond a reasonable doubt that Defendant's blood alcohol content was .20 or above. The trial court gave Defendant a sentence of eleven months and twenty-nine days at 75% and suspended that sentence except for seven days. Soon after, this timely appeal followed.

*Analysis*

*I. Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to support her conviction because the State failed to prove that she was operating her motor vehicle in an apartment complex frequented by the public at large. The State counters by arguing that Defendant was properly convicted for driving under the influence because she was driving in an apartment complex and gated communities are not beyond the reach of Tennessee Code Annotated section 55-10-401. We agree with the State.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. In a bench trial, the judge is the trier of fact, and "the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Farrar*, 355 S.W.3d 582, 585 (Tenn. Crim. App. 2011) (quoting *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)); *see also State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.

1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The first step of a sufficiency analysis is to "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Henderson*, 531 S.W.3d 687, 691 (Tenn. 2017). Our role in statutory interpretation "is to assign a statute the full effect of the legislative intent without restricting or expanding the intended scope of the statute." *State v. Dycus*, 456 S.W.3d 918, 924 (Tenn. 2015) (citing *State v. Springer*, 406 S.W.3d 526, 533 (Tenn. 2013) and *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010)). "[W]e look to the plain language of the statute to determine the intent of the legislature." *Id.* (citing *State v. Jennings*, 130 S.W.3d 43, 46 (Tenn. 2004)). We do so with the presumption that "every word in the statute has meaning and purpose and should be given full effect if the obvious intent of the General Assembly is not violated by so doing." *Marshall*, 319 S.W.3d at 561 (quoting *Larsen-Ball v. Ball*, 301 S.W.3d 228, 232 (Tenn. 2010)). "When the language of the statute is clear and unambiguous, 'the legislative intent shall be derived from the plain and ordinary meaning of the statutory language.'" *Dycus*, 531 S.W.3d at 691 (quoting *State v. Wilson*, 132 S.W.3d 340, 341 (Tenn. 2004)). If the language of the statute is ambiguous, we will look at the entire statutory scheme and use the canons of statutory construction to ascertain the legislative intent. *Id.*

As applicable in this case, Tennessee Code Annotated section 55-10-401 states the following:

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads or

highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park, or apartment house complex, or any other premises that is generally frequented by the public at large while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess; [or]

(2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more[.]

Defendant's argument on appeal focuses on an issue of statutory interpretation. Defendant proposes to this Court that the descriptive phrase "generally frequented by the public at large" does not only apply to "any other premises." Rather, Defendant contends that the descriptive phrase also applies to "apartment house complex." We disagree with Defendant's grammatical gymnastics. The statute is unambiguous. The plain language of the statute presents an ordinal list of locations where driving under the influence is prohibited. From the language of the statute, it is obvious that "any of the public roads or highways of the state," "any streets or alleys," "the premises of any shopping center, trailer park, or apartment house complex," and "any other premises that is generally frequented by the public at large" are each separate and distinct locations that are listed by the legislature as places where driving under the influence is prohibited. To take a phrase that is describing only one of the items in the ordinal list and apply the restrictive nature of that descriptive phrase to another separate and distinct item in the list contorts the plain language of the statute. The phrase "generally frequented by the public at large," as used in the statute, does not apply to "apartment house complex." Thus, the State need not put on additional proof that an "apartment house complex" is "frequented by the public at large."

Now that the requisite elements have been established, we turn our eyes to the proof presented at trial. Viewing the evidence in a light most favorable to the State, it is obvious from the circumstantial evidence that Defendant was impaired by an intoxicant. She fell down, she vomited, she swayed while standing, she slurred her speech, she smelled of alcohol, and she spoke irrationally. Nearly all of the telltale signs of impairment were present. Additionally, forensic analysis revealed that her blood alcohol content was .215 grams percent at the time that her blood was drawn. While impaired, Defendant was clearly driving or in physical control of a vehicle on the premises of an apartment house complex. A rational trier of fact could find beyond a reasonable doubt

that Defendant was guilty of both driving under the influence by impairment and driving under the influence per se.

## II. *Motion to Suppress*

Defendant contends that the trial court erred when it denied her motion to suppress and argues that the stop of her vehicle was constitutionally invalid because Officer Roach did not have reasonable suspicion that Defendant had committed or was about to commit a criminal offense. The State responds that Officer Roach had reasonable suspicion to stop Defendant based on the information about Defendant's actions that was relayed to him by Mr. Pszenitzki. We agree with the State.

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. *See State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009).

When evaluating the constitutionality of warrantless seizures, this Court must "evaluate the search or seizure under traditional standards of reasonableness" by balancing an individual's privacy interests against legitimate governmental interests. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless seizure passes constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

"One exception to the warrant requirement exists when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Binnette*, 33 S.W.3d at 218 (citing *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997)). The moment that a police officer turns on the blue lights on his patrol vehicle, the "police officer has clearly initiated a stop and has seized the subject of the stop." *Id*. In such cases, the police officer must have reasonable suspicion of criminal activity, supported by specific and articulable facts, at the time that the police officer turns on the blue lights. *Id*. "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity . . . , and it is determined by considering the totality of the circumstances surrounding the stop[.]" *Id*. (internal

citations omitted). "Those circumstances include the objective observations of the police officer, information obtained from other officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." *State v. Day*, 263 S.W.3d 891, 903 (Tenn. 2008). A tip from a known informant, by itself, can establish reasonable suspicion for a vehicle stop. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972). We review the validity of a stop from a "purely objective perspective," and this Court may consider "relevant circumstances demonstrated by the proof even if not articulated by the testifying officer as the reasons for the stop." *State v. Smith*, 484 S.W.3d 393, 402 (Tenn. 2016).

Generally, we will uphold a trial court's findings of fact at a suppression hearing unless the evidence preponderates to the contrary. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). When evaluating the correctness of a trial court's ruling on a motion to suppress, this Court may consider both the evidence from the suppression hearing and the trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). As to the trial court's application of the law to the facts, however, we apply a de novo standard of review. *Keith*, 978 S.W.2d at 864.

At the outset of our analysis, we note that Officer Roach's testimony at the hearing on the motion to suppress was essentially the same as his testimony at trial. Thus, it does not bear repeating the same facts. In the present case, Defendant was "seized" within the meaning of the state and federal constitutions the moment Officer Roach activated his car's blue lights. In order for that seizure to be constitutionally valid, Officer Roach must have possessed at least reasonable suspicion, supported by specific and articulable facts, that Defendant had committed or was about to commit an offense. At the time that Officer Roach turned on the blue lights on his patrol car, he possessed information given to him by Mr. Pszenitzki that Defendant erratically parked one vehicle, fell multiple times, appeared to have vomited, reentered a different vehicle, and began driving. Mr. Pszenitzki identified the vehicle that Defendant was driving, and Officer Roach saw that vehicle upon arriving on the premises of the apartment complex. Because an apartment complex is a location where driving under the influence is prohibited, as determined above, Officer Roach had reasonable suspicion that Defendant was committing the crime of driving under the influence. Thus, his stop of Defendant was constitutional.

*Conclusion*

For the aforementioned reasons, we affirm the judgments of the trial court. However, we remand this case for entry of a corrected judgment document in Count One, which should indicate that Count One merges with Count Two. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015).

_____
TIMOTHY L. EASTER, JUDGE