IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville September 26, 2018

**STATE OF TENNESSEE v. SONCEARAE LOBBINS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04801    Paula Skahan, Judge**

_____

**No. W2017-01398-CCA-R3-CD**
_____

A Shelby County jury convicted the Defendant, Soncearae Lobbins, of two counts of aggravated kidnapping and one count of robbery. The trial court sentenced the Defendant to ten years of incarceration. On appeal, the Defendant claims that: (1) the evidence is insufficient to support her convictions; (2) the trial court erred when it failed to require the State to make a proper election of offenses; (3) the trial court's jury instructions failed to ensure that the jury's verdicts were unanimous as to each conviction; and (4) the trial court committed errors during sentencing. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Beth Brooks (on appeal); Mitchell W. Wood and Patrick R. Barnes (at trial), Memphis, Tennessee for the appellant, Soncearae Lobbins.

Herbert H. Slattery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Stark, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

This case arises from the Defendant's participation in the kidnapping and robbery of the victim. For the Defendant's role in these crimes, she was indicted for two counts of aggravated kidnapping and one count of robbery. One of her co-defendants, Evelina Garrett, was tried jointly with the Defendant, but the trial court declared a mistrial in Ms. Garrett's case. The trial court proceeded with the trial of the Defendant.

# I. Facts
## A. Trial

At the Defendant's trial on these charges, the parties presented the following evidence: Regenoild Rash, the victim, testified that he had known the Defendant for approximately five years after having met her at a club. The two entered into a relationship that lasted for almost two years. At some point the two became engaged and moved into an apartment together. While they lived together, Mr. Rash paid most of the couple's bills; he received a veteran's disability check from the federal government and was also working. Mr. Rash's disability came from serving in the military, and he wore a colostomy bag as a result of that disability. Mr. Rash arranged for his disability check to be deposited into the Defendant's checking account; he clarified that they did not have a joint checking account but rather they shared a number of accounts. In October of 2013, the relationship ended, and Mr. Rash went to live with his mother. He kept in periodic contact with the Defendant and described them as having a complicated relationship.

Mr. Rash testified that he filed a fraud claim with the bank where his disability check was being deposited. He clarified that he and the Defendant had "linked up" their accounts, but the accounts remained separate. During the process of filing the fraud claim with the bank, the bank investigator froze one of the accounts Mr. Rash shared with the Defendant. She came to him soon after, asking for $400.00 to pay her car note, which Mr. Rash gave to her. The following day, Mr. Rash and the Defendant made plans to "hook up for sex." The Defendant picked up Mr. Rash in her car; he told her that he had money to pay for a hotel room. However, the Defendant drove her car to an apartment building; Mr. Rash stated that the Defendant "chose" the location. She parked the car and the two got into her backseat and began having sexual intercourse. Mr. Rash took his clothes off, and the Defendant took her pants off. Mr. Rash was lying on his back, with the Defendant lying on top of him, when the car door opened and a man standing outside the car tried to "taser" Mr. Rash. The taser was pink, and Mr. Rash stated that the Defendant had owned a pink taser in the past. Mr. Rash fought off the man who then kicked Mr. Rash in the face and took Mr. Rash's pants and fled. Mr. Rash got out of the car, naked, and ran to the apartments to flag someone down for help. Mr. Rash told the Defendant to let "them" take whatever they wanted. Mr. Rash added there was a woman with the man who attacked him, later identified as Evelina Garrett.

While Mr. Rash was attempting to get help at the apartments, the man with the taser, Ms. Garrett, and the Defendant all got into the Defendant's vehicle and drove towards him. Mr. Rash testified that they were trying to run him over. Ms. Garrett then told Mr. Rash to "get in the car," and he complied. In the car, the man with the taser got in the front seat with Mr. Rash's pants, which contained his wallet with $170.00 cash, Mr. Rash's phone and keys. The man told Mr. Rash he would kill him if Mr. Rash made

any sudden moves. The man told Mr. Rash that he had a gun although Mr. Rash never saw it. The group then drove to a Bank of America and used Mr. Rash's ATM card to withdraw money. Mr. Rash provided the pin number, and Ms. Garrett withdrew $400.00 from Mr. Rash's bank account. Mr. Rash stated that he feared for his life. Next, the group drove to a gas station where the man gave Mr. Rash his pants and told him to get out of the car. The man kept Mr. Rash's wallet and phone. Mr. Rash used a passerby's telephone and called the police.

Mr. Rash was concerned for the Defendant, thinking that they both had been robbed and kidnapped, which he relayed to the police. Another sum of money was later withdrawn from his bank account. Mr. Rash testified that he did not know Ms. Garrett but had seen her before. He recalled that, after this incident, she apologized to him for her role.

On cross-examination, Mr. Rash testified that the Defendant worked as an accountant at the time of the kidnapping. He stated that he and the Defendant would give each other money periodically when the other needed it but that the money was not a loan. Mr. Rash agreed that he gave the Defendant $400.00 two days before the kidnapping event. He clarified that his disability check was directly deposited into the Defendant's bank account when they were in a relationship but that he discontinued directly depositing his check when they broke up.

Mr. Rash said it was not uncommon for him and the Defendant to meet up for sexual encounters. Testifying about the Defendant's "role" in the kidnapping event and robbery, Mr. Rash said that the Defendant did not tell him to get out of the car and did not tell him to get back in. She did not ask him to give her any of his possessions; she did not suggest going to the ATM; and she did not withdraw money from the ATM. Mr. Rash recalled that the Defendant asked the man and Ms. Garrett not to hurt her child.

Mr. Rash stated that the man and Ms. Garrett told the Defendant that they were going to take her car. When the man and Ms. Garrett dropped Mr. Rash off at the gas station, the Defendant asked to get out as well but they told her not to. The man told Mr. Rash that he would kill him if Mr. Rash called the police.

Mr. Rash clarified that, after he ran away from the car, Ms. Garrett and the Defendant were still inside the car and the man had run off. Ms. Garrett then drove towards him in a manner indicating that she was going to hit him with the car. Ms. Garrett instructed Mr. Rash to get into the car; the man returned and also got into the car, still holding Mr. Rash's pants.

On redirect-examination, Mr. Rash stated that immediately after the kidnapping

event and robbery he thought that the Defendant was still in danger.  Mr. Rash agreed that he never saw a weapon other than the taser.

Lieutenant Byron Braxton testified that he worked for the Memphis Police Department and learned of the crime committed against Mr. Rash on May 29, 2014.  He arrived at the police station and was told that Mr. Rash had been kidnapped and robbed and that the female who was with him, the Defendant, was missing.  The Defendant was eventually located by the Project Safe Neighborhood Task Force, and she told investigators that she had been kidnapped and sexually assaulted.  Lieutenant Braxton met with the Defendant, and she told him that she had been in a relationship with Mr. Rash.  She had asked to borrow money from him and then wanted to thank him sexually.  She suggested they drive to an abandoned apartment complex and, once there, while they were in the backseat, a female came out of nowhere.  The Defendant told Lieutenant Braxton that she did not know the woman; a man also appeared and attacked Mr. Rash.  She said that the woman and man then drove the Defendant and Mr. Rash to an ATM and withdrew money from Mr. Rash's account.  The Defendant told Lieutenant Braxton that Mr. Rash was released and that she was then taken to an area where she was sexually assaulted.

Lieutenant Braxton noticed an inconsistency while the Defendant was giving her statement: Mr. Rash had told the police that the Defendant suggested going to the abandoned apartment complex and the Defendant stated that it was Mr. Rash's suggestion.  When confronted, the Defendant maintained her version of events.  Lieutenant Braxton also discovered, by looking at the Defendant's cell phone records, that she had "a lot of contact" with Ms. Garrett on the day of the kidnapping event.  The Defendant maintained that she did not know Ms. Garrett or the man with her.  Lieutenant Braxton concluded his interview with the Defendant and went to interview Ms. Garrett, who was in custody.  Ms. Garrett admitted to Lieutenant Braxton that she had been involved in the crime and stated that she "was approached" about robbing someone.  Ms. Garrett agreed to the proposition but wanted to involve a man.  Ms. Garrett found a man to go along with the plan, which was to hide in an abandoned apartment building and when Mr. Rash pulled up in his car, Ms. Garrett and the man would "execute[ ] the robbery."  Ms. Garrett detailed the events consistently with Mr. Rash's testimony.

Lieutenant Braxton spoke to the Defendant again after his interview with Ms. Garrett.  The Defendant then admitted her participation in the robbery, telling Lieutenant Braxton that she "made the arrangements for it" and had suggested that she and Mr. Rash go to the abandoned apartment building to have sex.  The Defendant signed a sworn written statement, as did Ms. Garrett.  Both statements were admitted into the record, as were the Defendant's phone records.  Lieutenant Braxton said that the phone records revealed that the Defendant had called Ms. Garrett multiple times on the day of the

4

robbery.

On cross-examination, Lieutenant Braxton said that he learned through his investigation that the man with the taser was Ms. Garrett's boyfriend. The Defendant told Lieutenant Braxton that the boyfriend was the one who choreographed the robbery and threatened harm to her family. She maintained that she was raped by him but that claim was not investigated further. The Defendant told Lieutenant Braxton that the plan was for her to bring Mr. Rash to the apartment complex and Ms. Garrett and her boyfriend would "handle the rest." The Defendant had known Ms. Garrett for two weeks prior to the robbery.

On redirect-examination, Lieutenant Braxton stated that, after the robbery was over and the Defendant was no longer with Ms. Garrett and her boyfriend, the Defendant did not call the police. The police attempted to locate her, on the assumption that she had been kidnapped, and found her in a hotel room with another man engaging in sexual intercourse. After the Defendant was taken to the police station, phone records show that the Defendant attempted to contact Ms. Garrett by phone.

Joyce Smith-Brown, a Walmart employee, testified that, as part of her duties, she operated the security videotapes in the store and provided them to law enforcement when requested. She identified a video recording of the "Money Center" inside the Walmart. She also identified a receipt from the Money Center, dated the day of the robbery, showing a withdrawal on a debit card of $680.70.

Evelina Garrett testified that she had volunteered information about the robbery and was testifying willingly. She stated that she knew the Defendant through her cousin. Ms. Garrett recalled that the Defendant approached Ms. Garrett about a way the two women could get some money because the Defendant "had a guy's bank account number" and access to the account. She told Ms. Garrett that she was having a disagreement with Mr. Rash over their shared account, which had been frozen and that she wanted to "get back" at him. The "plan" was to set up a "double date" between Mr. Rash, Ms. Garrett, and the Defendant for a sexual "thing."

Ms. Garrett testified that the Defendant did not want to rob Mr. Rash without another man present in case Mr. Rash fought back, and so the two women found "a guy in the apartments and he agreed to ride along" with them (hereinafter referred to as "accomplice"). Ms. Garrett knew the man from being in her apartment complex, and she knew him to be experienced with robberies. Ms. Garrett denied any romantic relationship with him. The Defendant drove Ms. Garrett and her accomplice to the abandoned apartments and left them there while she went to pick up Mr. Rash. From inside the apartment building, Ms. Garrett and her accomplice observed the Defendant

5

and Mr. Rash arrive at the abandoned apartment building and move to the backseat of the car to have sex.

Ms. Garrett testified that she was too scared to rob Mr. Rash, so her accomplice volunteered to do it. Ms. Garrett's accomplice opened the car door and used a taser the Defendant had given them before the robbery. The Defendant had also given Ms. Garrett her wallet in order to "make it look like [they were] robbing her and [Mr. Rash]." The accomplice grabbed Mr. Rash's pants and took off running. Mr. Rash then got out of the car and ran towards the apartment building. Ms. Garrett testified that she did not know what to do at this point but that the Defendant encouraged her to "go along with it." Ms. Garrett pursued Mr. Rash in the car and told him to get in the backseat. They then picked up the accomplice and drove to a bank where Mr. Rash provided his PIN number. Ms. Garrett withdrew $600.00 from Mr. Rash's account and then dropped him off at the gas station.

After dropping the victim off at the gas station, the group drove to Walmart where the Defendant and her accomplice went inside. They "got a money order" in the amount of $680.00 using the victim's debit card and then took the money order to a Cash Express to cash it.

Based on this evidence, the jury convicted the Defendant of two counts of aggravated kidnapping and one count of robbery.

## B. Sentencing

At the Defendant's sentencing hearing, the following evidence was presented: Frankie Surall testified that she is the Defendant's mother. She stated that the Defendant had a son who was living with Ms. Surall at the time of the Defendant's crimes. Ms. Surall explained that Mr. Rash and the Defendant had joint or shared bank accounts in the past because Mr. Rash was unable to open an account individually because of financial problems. She stated that Mr. Rash was a "nice guy." Ms. Surall stated that she did not believe the Defendant orchestrated the kidnapping and robbery. She stated that the Defendant loved her son and that he had suffered since the Defendant had been away from him.

Rachel McCray testified that she is the Defendant's sister and that they had not had a good relationship in the past. She testified, however, that in the two years prior to the hearing, the Defendant had changed and improved.

The Defendant testified that she felt remorse for her crimes and had apologized to Mr. Rash. She stated that she had made bad decisions and that she had lost sight of what

was important, mostly her love for her son. The Defendant stated that she had been prescribed medication for bipolar disorder which had helped her. She agreed that she had been caught shoplifting in the past and had been accused by a former employer of embezzling funds. The Defendant agreed that she had lied in her presentence report about her education.

On cross-examination, the Defendant stated that she was sorry for "setting up" Mr. Rash to be robbed. She stated that she had been approached by Ms. Garrett and Ms. Garrett's accomplice about committing the robbery and maintained that the accomplice raped her that day.

The Defendant's pre-sentence report was entered into the record. The trial court stated that the Defendant was a Range I offender with two prior theft convictions. The trial court applied enhancement factor (1), that the Defendant had "a previous history of criminal convictions or criminal behavior[.]" T.C.A. § 40-35-114(1) (2014). The trial court applied factor (2), that the Defendant was "a leader in the commission of an offense involving two (2) or more criminal actors[,]" based on the evidence that the Defendant recruited Ms. Garrett to be involved in the criminal activity and then found a man to participate. § 40-35-114(2). The trial court applied factor (4), that Mr. Rash "was particularly vulnerable because of age or physical or mental disability[,]" based on the evidence presented that Mr. Rash wore a colostomy bag as a result of a disability. § 40-35-114(4). The trial court applied factor (6), that "the amount of damage to property sustained by or taken from, the victim was particularly great[,]" based on the evidence that the amount of money taken from Mr. Rash was the entirety of his bank account. § 40-35-114(6). The trial court applied factor (10), that the Defendant had no hesitation in committing the crime despite the high risk to human life. § 40-35-114(10). The trial court applied factor (14), that the Defendant abused a position of private trust based on her personal relationship with Mr. Rash which allowed her to facilitate the offense. § 40-35-114(14).

The trial court merged the two counts of aggravated kidnapping and imposed concurrent ten-year sentences for the remaining convictions. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence was insufficient to support her convictions; (2) the trial court erred when it failed to require the State to make a proper election of offenses; (3) the trial court's jury instructions failed to ensure that the jury's verdicts were unanimous as to each conviction; and (4) the trial court committed errors during sentencing.

# A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain her convictions. She contends that the State failed to prove the elements of false imprisonment in both aggravated kidnapping counts. She further contends that there was insufficient proof of the facilitation of robbery element in Count 1, and of bodily injury in Count 2, because the injury to Mr. Rash's face when kicked did not occur during the unlawful confinement in the vehicle. The State responds that the evidence is sufficient to sustain the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting

*State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### i. Aggravated Kidnapping

Tennessee Code Annotated section 39-13-304 defines aggravated kidnapping as:

(a) Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed:

> (1) To facilitate the commission of any felony or flight thereafter; [or]

> . . . .

> (4) Where the victim suffers bodily injury;

(b)(1) Aggravated kidnapping is a Class B felony.

T.C.A. § 39-13-304 (2014). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302 (2014). "Bodily injury" includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or

impairment of the function of a bodily member, organ, or mental faculty.  T.C.A. § 39-11-106 (2014).

The Defendant was charged with aggravated kidnapping in Count 1 as follows:

. . . did unlawfully or knowingly remove or confine REGINOILD RASH so as to substantially interfere with the liberty of the said REGINOILD RASH, in order to facilitate the commission of the felony of Robbery.

The Defendant was charged with aggravated kidnapping in Count 2 as follows:

. . . did unlawfully and knowingly remove or confine REGINOILD RASH so as to substantially interfere with the liberty of the said REGINOILD RASH, and the said REGINOILD RASH did suffer bodily injury. . .

Count 1 remained after the trial court merged the two convictions.

The evidence, viewed in the light most favorable to the State, is sufficient to support the Defendant's two aggravated kidnapping convictions and her conviction for robbery.  The victim testified that while inside the Defendant's car and during their sexual encounter, he was physically attacked with a taser and kicked in the face by the Defendant's and Ms. Garrett's accomplice.  The accomplice stole the victim's pants with his wallet and phone, along with other personal items, inside.  The victim ran away from the vehicle naked but, when the women drove towards him in the vehicle, making him believe they would hit him with the car, he got back inside.  The women then drove to an ATM where, under the threat of harm, Mr. Rash provided access to his bank account, and they withdrew money.  After withdrawing money, the group took the victim from the ATM to a gas station where they released him.  The Defendant was also physically threatened with violence or death, and he testified that he believed there was a gun inside the vehicle.  This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the victim was unlawfully confined in substantial interference with his liberty in order to facilitate the robbery.  Similarly, based on the evidence that the victim was kicked in the face during the course of events that led to his confinement, there was sufficient evidence from which a jury could conclude that the victim was kidnapped and suffered bodily injury.

**ii. Robbery**

A conviction for robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2014).

The evidence, viewed in the light most favorable to the State, was that the Defendant created a plan to rob Mr. Rash of his money and solicited help from Ms. Garrett, who also solicited help from an unidentified male accomplice. The accomplice attacked Mr. Rash, who ran away naked. The women then forced Mr. Rash back inside the vehicle, following which they drove to an ATM where Mr. Rash gave them his PIN number to withdraw money from his bank account. He testified that he was in fear for his life and that the accomplice threatened to kill him with a gun. This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the Defendant was guilty of robbery.

The Defendant argues that the kidnapping offense was incidental to the robbery offense and that the State did not prove beyond a reasonable doubt that the kidnapping was not incidental to the robbery. *See State v. White*, 362 S.W.3d 559 (Tenn. 2012). We disagree. Before arriving at the ATM, the Defendant and her accomplices confined Mr. Rash in the vehicle. After the Defendant and her accomplices used Mr. Rash's PIN to withdraw money from his bank account, they drove away from the ATM and dropped Mr. Rash off at a gas station. Mr. Rash's period of confinement lasted longer than necessary to accomplish the robbery, and therefore was not incidental to the robbery itself. Accordingly, the Defendant is not entitled to relief on this issue.

### B. Election of Offenses

The Defendant next contends that the trial court erred when it failed to require the State to make a proper election of offenses relevant to Count 1, aggravated kidnapping in order to facilitate a robbery, and Count 3, robbery. The Defendant argues that the robbery at the ATM was a separate offense from the robbery at Walmart. She concedes that this issue is subject to plain error review, as the issue was not raised at trial or in the Defendant's motion for new trial. The State argues that this issue is waived for the reasons conceded, but notwithstanding the waiver, the State argues that an election of offenses was not required because the robbery was ongoing from the time of the ATM withdrawal to the time of the Walmart withdrawal. The State contends the robbery was not complete until all the money was taken, and thus it was not required to make an election as to which portion of the events was the basis for the indictment.

We may review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b). The doctrine of plain error only applies when all five

of the following factors have been established:

> (1) the record clearly establishes what occurred in the trial court;
> (2) the error breached a clear and unequivocal rule of law;
> (3) the error adversely affected a substantial right of the complaining party;
> (4) the error was not waived for tactical reasons; and
> (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). All five factors must be present for plain error review. *See State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). It is the accused's burden to persuade an appellate court that the trial court committed plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Further, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283.

Our supreme court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial which indicates that the defendant has committed multiple offenses against the victim. *See State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). The requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *Brown*, 992 S.W.2d at 391.

The requirement of election and a jury unanimity instruction exists even if a defendant has not requested one. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court, even absent a request from the defendant, to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *Shelton*, 851 S.W.2d at 137. Moreover, failure to follow the procedures is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. *See State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000); *see also Shelton*, 851 S.W.2d at 138.

Our supreme court has concluded that a trial court's "failure to instruct the jury properly about the State's election of offenses may be cured by a prosecutor's closing argument if it provides an effective substitute for the missing instruction." *State v. Knowles*, 470 S.W.3d 416, 427 (Tenn. 2015).

We conclude that the trial court did not err in failing to require the State to elect offenses. Our supreme court recently addressed a case of aggravated robbery and what factors determined the moment in time when the offense could be considered "completed." *State v. Henderson*, 531 S.W.3d 687 (Tenn. 2017). Our supreme court stated that the inquiry should focus on

> circumstances indicative of the defendant's conduct and intent to determine whether, at the moment in time at issue, the defendant has definitively completed every element of the underlying theft. This focus should include an examination of whether the defendant has completed his theft of all the property he intended to steal.

531 S.W.3d at 696. In the present case, the evidence indicates that the robbery was not "complete" until after the second withdrawal from Walmart using the same debit card that had been used at the ATM and with the same PIN that Mr. Rash provided. On this basis, we agree with the State that there was not duplicitous conduct presenting a unanimity problem. In this case, the robbery was one set of events and thus an election was not required. Accordingly, the Defendant is not entitled to plain error relief, as a clear and unequivocal rule of law was not breached.

## C. Jury Instruction

In concert with her argument regarding the election of offenses addressed above, the Defendant contends that the trial court failed to properly instruct the jury to ensure a unanimous verdict as to the particular acts which constituted the charged offenses.

As we stated above, because the election requirement is "fundamental, immediately touching the constitutional rights of an accused," a trial court has a duty even absent a request by the defendant to ensure the timely election of offenses by the State and to properly instruct the jury concerning the requirement of a unanimous verdict. *Burlison*, 501 S.W.2d at 804. We have concluded that the robbery here was one event and did not present multiple instances of conduct upon which a jury could return a patchwork verdict. Accordingly, an instruction regarding the State's election of offenses and the accompanying unanimity instruction was not required.

## D. Sentencing

13

The Defendant lastly contends that the trial court erred when it sentenced her because it improperly applied enhancement factors to her sentence. She contends that factors (4), (6), (10), and (14) were misapplied. *See* T.C.A. § 40-35-114 (2014). The State responds that the trial court properly sentenced the Defendant.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. The defendant bears "[t]he burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The misapplication of an enhancement or mitigating factor does not necessarily remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, at 708. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

We agree with the Defendant that the trial court misapplied two enhancement factors. The trial court considered the relevant principles and sentenced the Defendant to a within-range sentence. The evidence presented at trial and during the sentencing hearing supports the trial court's application of enhancement factor (4), that the victim "was particularly vulnerable because of age or physical or mental disability[,]" based on evidence presented that Mr. Rash wore a colostomy bag. We conclude that this factor was properly applied. The evidence similarly supported the application of factor (6), that "the amount of . . . property . . . taken from, the victim was particularly great," based on the evidence that a large sum of money was taken from Mr. Rash's bank account.

We conclude that the evidence does not support the application of factor (10), that "the [D]efendant had no hesitation about committing a crime when the risk to human life was high," based on the evidence that Mr. Rash was "tased" when naked. This factor was not properly applied because there was no evidence that any other person was at risk, other than Mr. Rash. *State v. Jordan Mansfield Looper*, No. M2012-02523-CCA-R3-CD, 2013 WL 4647629, at *4 n.4 (Tenn. Crim. App., at Nashville, Aug. 26, 2013) (citing *State v. Dean*, 76 S.W.3d 352, 381 (Tenn. Crim. App. 2001), *no perm. app. filed*.

Finally, we conclude that the evidence does not support the application of factor (14), that "the [D]efendant abused a position of . . . private trust, . . . in a manner that significantly facilitated the commission or the fulfillment of the offense." The State concedes that this factor was applied in error. The trial court applied this factor based on the Defendant's and Mr. Rash's close personal relationship and that she lured him to a remote location for sex before robbing and kidnapping him. Their relationship, without evidence of a "degree of vulnerability" that is exploited to "achieve criminal purposes," is not sufficient standing alone to support the application of this factor. *See State v. Terrence Lamont McDonald*, No. E2013-02524-CCA-R3-CD, 2015 WL 154251, at *19 (Tenn. Crim. App., at Knoxville, Jan. 13, 2015) (citing *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999); quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)), *perm. app. denied* (Tenn. May 14, 2015).

As we have stated, the misapplication of an enhancement factor does not automatically invalidate a trial court's sentencing decision. A within-range sentence consistent with the sentencing guidelines should be upheld and thus, we affirm the trial court's imposition of the Defendant's sentence. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE